16799

McLAUCHLIN *ET AL.* v. GRESSETTE *ET AL.*

(79 S. E. (2d) 149)

*Messrs. L. Marion Gressette,* of St. Matthews, and *Charles B. Elliott*, of Columbia, *for Appellants,*

*Messrs. T. P. Taylor* and *Isadore S. Bernstein,* of Columbia, *for Respondents,*

The following is the order of Judge Brailsford:

This action to enforce specific performance of an alleged oral contract to devise real estate is before me on exceptions by plaintiffs to the report of Honorable C. E. Summers, Special Referee, which recommended dismissal of the complaint, principally upon the ground that the alleged contract has not been established by testimony which is "clear, strong and convincing".

The original plaintiffs were W. Frank McLauchlin and his wife, Myrtis McLauchlin. The defendants are Honorable L. Marion Gressette and others as Trustees of the First Baptist Church of St. Matthews and Ernest Whetstone and E. W. Keller, as executors of the will of Lula Buyck Keller, deceased. The plaintiff, W. Frank McLauchlin, died pending the action, survived by his wife and his son, W. Frank McLauchlin, Jr., as his only heirs at law, and proper substitution of parties has been made. Unless otherwise specified, reference to plaintiffs in this order will designate the original plaintiffs.

The claim of plaintiffs as set forth in the complaint is, briefly, as follows: On or about August 1st, 1948, Mrs. Keller, the testatrix, proposed to plaintiffs that if they would move into an apartment in her home in the town of St.

Matthews and live there and assist her until her death, she would devise the home to them by her will. Plaintiffs thereafter accepted this offer, moved into the apartment and fully performed the agreement on their part until the death of the testatrix on March 21, 1952. In violation of the agreement, Mrs. Keller left of force a will dated August 24, 1951, whereby she devised the property in question to the Trustees of the First Baptist Church of St. Matthews. The prayer of the complaint is that defendants be directed to specifically perform the alleged agreement by conveying the property to plaintiffs.

The answer is, in effect, a denial of the allegations of the complaint with respect to the making of the contract and its performance by plaintiffs and the plea of the Statute of Frauds as a bar to the action.

Only three issues arise on these pleadings. (1) Has the alleged contract been established by the testimony? (2) If so, have plaintiffs performed on their part? (3) Is the action barred by the Statute of Frauds?

It follows that if the first two questions are answered in the affirmative and the third question is answered in the negative plaintiffs will be entitled to the relief sought.

(1) Has the Contract Been Established?

After a painstaking study of the record, I unfortunately, find myself in disagreement with the able Special Referee as to the sufficiency of the testimony to meet the strict burden of proof required to establish an oral contract to devise the property in question to plaintiffs. A somewhat extensive review of the evidence bearing on this issue is therefore necessary.

In my judgment, it can be fairly said that the following facts are undisputed.

The testatrix, Mrs. Lula Buyck Keller, became a widow for the second time some ten years prior to the commencement of this action. She had no children and her nearest

relatives were a number of nieces and nephews, among whom were three brothers, F. Buyck McLauchlin, Lawrence McLauchlin and the plaintiff, W. Frank McLauchlin.

Possessed of considerable wealth (her estate was appraised at $87,577.71) she owned and occupied a substantial residence (appraised at $12,500.00) in the town of St. Matthews. This residence was so arranged that a portion of it could be, and usually was, occupied as a separate apartment.

Mrs. Keller was served by a faithful maid and cook who did not "live in" ordinarily, but who was available as a nurse in time of need, and she also had a yard boy. In addition she selected the occupants of the apartment more from the standpoint of congeniality than from income. Nevertheless she considered it desirable to induce some member of her family to come to live with her for the remainder of her life.

While by no means an invalid, she was of advanced age, blind in one eye following an operation to remove cataracts and had a heart condition. She was independent by nature and liked to do things for herself. But she could not drive her automobile and was apprehensive about being alone in a helpless old age.

In 1943 or 1944 she explained her desires and, at least in part, the reasons for them to her nephew, F. Buyck McLauchlin. She told him that if his brother Lawrence McLauchlin and Lawrence's wife, Lucile, would move into her home and live with her until she died she would leave it to them by her Will. At her request, or with her consent, Mr. McLauchlin related this conversation to his brother. After further discussion between the principals, Lawrence and Lucile disposed of some of their household goods and moved into that portion of the dwelling occupied by Mrs. Keller. They lived together as a family and Mrs. Keller paid all of the household expenses, including the provision of food, fuel, utilities, etc.

Everyone concedes that Mrs. Keller at that time obligated herself to devise the home to Lawrence and Lucile if they would remain with her until her death.

However, despite the strong inducement of free living expenses and the promise of the home, the arrangement proved mutually unsatisfactory and, in the words of one witness, the parties "agreed to disagree". This was after they had lived together for about one year. This couple then moved into the other apartment in Mrs. Keller's home and lived there for a month or six weeks, while waiting for the house which they had formerly occupied to be vacated. They paid no rent for this period and, when they left, Mrs. Keller gave them $250.00, either as consideration for the rescission of the agreement or as a gratuity to help them restore some of the things they had disposed of.

It may be interpolated here that although Mrs. Keller was regarded as a religious woman of good moral character, all of the witnesses who testified to the point agreed that she was rather difficult to live with because of her imperious nature. She was positive and assertive, knew what she wanted and was not inclined to tolerate opposition to her wishes from those closely associated with her.

Apparently Mr. Fairey Prickett moved into the separate apartment shortly after Lawrence and Lucile left. He paid only $20.00 per month rent, although testifying that he would gladly have paid $45.00. The defendants' explanation, and probably the correct one, on this discrepancy is that Mrs. Keller wanted him in the apartment because of her close relationship with his family. It was not until he was about to leave, after an occupancy of three years, that Mrs. Keller renewed her effort to arrange for a member of the family to live with her.

Again she first discussed the question with F. Buyck McLauchlin. As the result of overtures which she made to them, first through him as intermediary and later in person, the plaintiffs, Frank McLauchlin, and his wife Myrtis in August

of 1948, after some hesitation on their part, moved into the separate apartment in Mrs. Keller's home. They resided there until after the death of testatrix on March 21, 1952.

The plaintiffs were not ordinary tenants. They paid no rent. They were there under some agreement proposed by Mrs. Keller which resulted in the mutual recognition of obligations incurred by them to her.

The sharp issue of fact between the parties is as to the terms of the proposal made by testatrix to plaintiffs; whether, as contended on the one hand, she promised them the home at her death, or whether, as contended on the other, she merely agreed that they might occupy the apartment free of rent.

With this background in mind let us turn to the evidence on which plaintiffs rely to establish the oral contract.

First the intermediary: F. Buyck McLauchlin testified that he made a point of visiting his aunt at least once a week. On one of these visits she asked him whether he thought that plaintiffs, the witness' brother and sister-in-law, would come to live with her. She said, "Would you mind feeling them out and see how they feel about it? I think we can get along if they will come and live with me. I will make the same proposition, (as that formerly made through this witness to Lawrence and Lucile, interpolated) leave them the home at my death."

Although the words "same proposition" were used, Mrs. Keller made it clear in this initial conversation that she wanted plaintiffs to move into the separate apartment, which was about to be vacated by Mr. Prickett. She did not propose a repetition of the living arrangement which had been unsatisfactory with the other couple.

Plaintiffs were living nearby in an apartment rented from Mrs. Charlotte McLauchlin Whetstone, a favorite niece of testatrix. The witness promptly related Mrs. Keller's proposal to them. He had no further conversation with Mrs.

Keller about the terms of the arrangement or agreement, either before or after plaintiffs moved into her home.

Only one other witness testified to any statement made by Mrs. Keller before plaintiffs finally accepted and acted upon her proposal. Mrs. W. B. Hildebrand, the operator of a beauty parlor in St. Matthews, which was regularly patronized by testatrix, testified that Mrs. Keller told her that "she was trying to get Myrtis and Frank to move in the house and was going to give them her house after her death * * *. She wanted Myrtis to be free, to drive her around and wait on her * * * wanted someone without ties or job, she was giving them the house at her death to do that for her."

This testimony may be as consistent with the expression of an intention on the part of testatrix as it is with a contractual offer. Nevertheless, the conversation must have taken place after she made a proposal to plaintiffs through Buyck McLauchlin and before its acceptance by them and, in my judgment, is corroborative of plaintiffs' claim that the proposal included a promise to devise the home.

This witness also testified to a number of statements made to her by testatrix while plaintiffs were living with her, to the general effect that she felt free to call on Myrtis for various services because she was leaving them her home.

We come now to the testimony of three apparently credible and wholly disinterested witnesses which, when considered in the light of the other evidence in the case brings conviction to my mind that Mrs. Keller did induce plaintiffs to come to live with her by promising to devise the home to them.

Mrs. Anginora Von Lee, Director of the Department of Public Welfare of Dorchester County, called on Mrs. Keller on December 2, 1948, to obtain some information in connection with her work. She was a former resident of Calhoun County and had once been elected as its Superintendent of Education. She had known Mrs. Keller "very pleasantly".

The witness testified that while in the home she asked Mrs. Keller who was living with her.

"She said Frank and Myrtis, Frank was her nephew. She had *begged* them to come there and live with her *permanently* and she would leave her home to them at her death, and they were to take care of her in her old age."

"Q. She begged them to come and live with her? A. Yes, would give them her home if they would come and live with her until she died.

"Q. Did she say whether or not she made the agreement with them? A. No.   *   *   *   She *promised* that she would do it.

"Q. She told you she had *promised* them that? A. *That is right."*

And again on cross examination:

"Q. Tell you whether or not they were receiving that (the apartment) rent free? A. She said she had *promised* them the home, she did not say the rent was free, did not say one way or the other about that.

"Q. That she had *promised* them the home? A. *Yes, sir, at her death, if they stayed with her and helped her in her old days."*

Mrs. Eloise Stack, who had known Mrs. Keller practically all of her life and who visited her occasionally, testified that on her first visit after plaintiffs had moved in Mrs. Keller told her:

"I made Myrtis and Frank the same *promise* I made Lucile and Lawrence.

"Q. Did she tell you what the *promise* was? A. She said, 'I am going to leave them my home place after my death if they stay on with me. I have to have someone in the house with me'   *   *   *".

When asked on cross examination how this conversation arose, the witness answered: "I don't remember. I believe

Myrtis was in there at the time I walked in and she left and she started talking about Myrtis."

Perhaps an even stronger statement of the contractual nature of the proposal was made by the last of the three witnesses referred to above, Mr. Marion Rily, a plumber and electrician, who frequently did work for Mrs. Keller. They were on friendly terms. He called her Aunt Lula, although they were no kin. In the witness' words, he "enjoyed talking to her. Tell everything she knew." She had previously told him about her arrangement with Lawrence and Lucile.

On an occasion, easily identifiable as the sudden freeze in the early winter of 1950, the witness went to Mrs. Keller's home to repair damaged plumbing. She poured him a cup of coffee and while they were seated at the kitchen table, in the words of the witness: "She got to talking to me, said 'I made Frank and Myrtis the same *proposition* I made Lawrence and Lucile, to come and live with me and *I will leave them the home place*. I told Myrtis I did not want her to be a slave, I am no invalid, but in my older days, I will need someone. The only thing I request of her now is to drive me around in my car.' She said, 'Don't you think that is a good *proposition*?' I told her, I call her Aunt, I said, 'Aunt Lula, if they turn you down, call on me and *I will take you up*.' "

The witness was asked on cross examination whether he remembered what started this conversation.

"A. No. I don't remember just how it started. Something was brought up about the pipes or something around there and I believe that Frank had offered to pay his part over their side. She said, 'No, I don't want Frank to pay any part.' I believe that is the way it started.

"Q. You do recall she did pay for repairing the pipes in the apartment occupied by Mr. and Mrs. Frank McLauchlin? A. Yes.

"Q. That is the way the conversation started. A. I believe that is the way it started."

I am impressed with that fact that the statements made to these three witnesses were volunteered by testatrix and that in each instance a reasonable and natural explanation as to what brought the subject to her mind was given.

Apropos the comment of Mr. Justice Stukes in *Young v. Levy,* 206 S. C. 1, 32 S. E. (2d) 889, on the testimony of the witness Prince, here the words "begged", "permanently", "promised", "promise" and "proposition" came from the lips of these witnesses without the least suggestion thereof in the questions of counsel.

The testimony of young Frank McLauchlin, Jr., is chiefly impressive for what he left unsaid. He lived with plaintiffs in the apartment from the time of his discharge from the Navy in 1948 until his marriage in August, 1949. The two conversations with his great-aunt to which he testified amount only to the expression of an intention that the property should belong to his parents at her death. If there had been any inclination to fabricate or exagerate it would have been so easy to give the statements made by her a contractual flavor.

Mr. W. B. Hildebrand, another witness for plaintiffs saw Mrs. Keller frequently at his wife's beauty parlor. She never made any statement in his presence as to the details or terms of her arrangement with plaintiffs but several times indicated that Mrs. McLauchlin was available to perform any service or assistance she might require because of being under obligation to her.

Mr. and Mrs. Lawrence McLauchlin were also sworn by plaintiffs. Their testimony requires no comment here because it was concerned largely with their own agreement with Mrs. Keller, which admittedly included the promise to devise the home.

The only other witness called by plaintiffs was Mr. Fairey Prickett, whose testimony did not bear on the question under discussion.

We come now to the testimony of defendants' witnesses as to statements made by Mrs. Keller, which are relied upon to disprove or cast doubt upon the existence of the contract claimed by plaintiffs.

Mr. H. W. Whetstone is one of the executors named in the will. He and his wife, Charlotte McLauchlin Whetstone, who has already been referred to as a favorite niece of testatrix, were her close neighbors. For a number of years he had managed her farming operations and assisted her in other business matters.

This witness testified that shortly after the move had been made, Mrs. Keller requested him to teach Myrtis to drive her automobile. When he refused upon the ground that he was too nervous, she replied " 'Oh, you are not too nervous. I will have to get someone. You know Myrtis moved in the house.' She said she gave her free rent to drive her around whenever she wanted to go. * * * I can cite plenty of occasions like that."

The witness then referred to another conversation, evidently after Mrs. McLauchlin had, at Mrs. Keller's request, been taught to drive by Mr. F. Buyck McLauchlin, when testatrix stated to him "* * * that is what I give Myrtis free house rent for, to go where I want to go."

Mrs. Charlotte McLauchlin Whetstone testified that she and her aunt were very close. "I guess I was about the closest person in her family to her." They were next door neighbors and visited back and forth "nearly every day". Plaintiffs had for a number of years rented an apartment from Mrs. Whetstone for which they paid $20.00 monthly. Yet she knew nothing about the proposal for them to move into her aunt's apartment, which had been pending for some time, until the day before they did so. Her reaction, as expressed to Myrtis was, "Well, that is a hell of a way to treat somebody." It was not until about two weeks later that the witness first discussed the subject with her aunt. Her version of this conversation will be quoted from the record.

"A. * * * She said, "Frank and Myrtis moved in with me.' I said, 'Both of you sort of gave me a dirty deal.' She said, 'I did not think about it at the time just how it looked.' She said, 'You know I am getting old, I want somebody to be in the house with me at night and somebody to drive me around, I hate to be dependent on any of you to take me around. I have not had a chauffeur since Alfred left. I asked Frank and Myrtis if they would come, I would give them that apartment free of rent.'

"Q. Did she say anything about whether she had any agreement with them as with Lawrence and Lucile? A. She said, 'I learned a dear lesson. I will never obligate myself again. I have had my stomach full.'

"Q. The agreement with Frank and Myrtis was free house rent? A. Yes, give them free house rent if they would come and stay with her. Said she had learned a dear lesson with experience of the other couple and would never obligate herself or make such a promise to anybody again."

Obviously, when the witness testified that the "agreement" with plaintiffs was limited to free rent, she was merely giving her interpretation of the conversation previously quoted. This is likewise true as to the remainder of her testimony on the point, except for her reference to a later conversation the substance of which will be stated in passing upon the third question involved.

The only other witness who testified for defendants as to a conversation with Mrs. Keller, *prior to the execution of the will dated August 24, 1951,* was Mr. T. Marion Buyck, Deacon and Organist in the church to which the property was devised and Mrs. Keller's first cousin. The substance of his testimony is found in the following quotation from the record:

"A. I went over one night (about ten days after plaintiffs moved in, interpolated) and asked if she made the same proposition with Frank and Myrtis as she had made with Lawrence and Lucile. She said, 'No, I will never do that

again. I don't want to get messed up like that.' She said she had promised Frank and Myrtis free house rent.

"Q. She said that was the arrangement made? A. Yes."

The last witness on the point for defendants was Mrs. Ada B. McLauchlin. She had lived in Columbia for the past thirty-eight years but was Mrs. Keller's first cousin and visited her whenever she could. This witness testified that in about October of 1951, she asked Mrs. Keller the "direct question" of whether "she had made Frank and Myrtis the same promise she made Lawrence and Lucile about the house. She looked at me very quickly and said, 'Indeed not * * * why should I if I give them free rent?' "

As I view the record, this is the only testimony as to a distinct disavowal by testatrix that her apartment with plaintiffs included a promise to devise the home to them. Since the conversation took place *some two months after the last will had been executed* it is entitled to little, if any, weight. It would have been unnatural for testatrix to answer this "direct question" in a manner totally inconsistent with that will.

Defendants argue, first, that the testimony of plaintiffs' witnesses, standing alone, is insufficient to establish a contract to devise, under the stringent burden of proof applicable in such cases. See *Young v. Levy,* 206 S. C. 1, 32 S. E. (2d) 889, where practically all of the earlier decisions on the subject are reviewed or cited; and, second, that the conflicting statements made to defendants' witnesses cast such doubt upon the issue as to defeat recovery.

The Special Referee adopted the view of defendants' counsel that Mrs. Keller had had two distinct agreements with Lawrence and Lucile and that this beclouded the meaning of the testimony of plaintiffs' witnesses, as to statements by her that she would make or had made the same proposition or promise to plaintiffs that she had made to Lawrence and Lucile.

This has reference to the short period (one month to six weeks) after the disagreement with Mrs. Keller during which Lawrence and Lucile occupied the separate apartment. It is true that the testimony of Lawrence McLauchlin, under skillful cross examination, may be construed to mean that he and his wife moved into this apartment with the understanding that they should have it free of rent in consideration of their staying with Mrs. Keller.

However, his testimony as a whole makes it crystal clear that this was a mere expedient, resorted to only until the house which they had formerly occupied could be vacated. This was but a step in effecting the rescission of the agreement between the parties. It is inconceivable to me that from three to five years later this temporary arrangement should have been in Mrs. Keller's mind as the promise which she had made to Mr. and Mrs. Lawrence McLauchlin.

As to the first proposition stated above, it need only be added that, in my judgment, the testimony relied upon by plaintiffs is not only clear and satisfactory, but compels conviction that testatrix did promise to devise the home to plaintiffs in consideration of performance of their part of the agreement.

The second proposition requires more extensive comment.

The statements made to E. W. Whetstone by testatrix are scarcely inconsistent with those made by her to plaintiffs' witnesses. She told him that she gave Myrtis free house rent to drive her around. She did not tell him that this constituted the entire agreement between the parties. She was under no obligation whatever to disclose all of the details of the arrangement to him, unless she chose to do so.

The same observation applies, in part, to the testimony of Charlotte McLauchlin Whetstone and T. Marion Buyck. These witnesses went further and testified that testatrix in statements to them emphatically denied that she had the same agreement with plaintiffs that she had formerly had with Lawrence and Lucile. This the witnesses *interpret* as

applying to the promise to devise the house. But the language attributed to testatrix makes it much more logical to believe that she had in mind the difference in the agreement as to occupancy.

She told Mr. Buyck, "I will never do that again. I don't want to get *messed up* like that." And she told Mrs. Whetstone, "I learned a *dear lesson*. I will never obligate myself again. I have had my *stomach full.*"

The arrangement Lawrence and Lucile contemplated their living with her permanently as members of her family and at her expense. It is clearly inferable from the record that this arrangement failed and discord developed between the parties despite *the promise to devise the home rather than because of it*. Testatrix had no difficulty in rescinding this part of the bargain when the other failed. The use of the words "messed up", "dear lesson" and "stomach full" is understandable only if they are associated with the unsuccessful attempt to have Lawrence and Lucile live with her permanently as members of one family. In this respect, her denial that the agreement with plaintiffs was the same is entirely accurate.

The record inspires confidence in the credibility and good faith of the witnesses for both plaintiffs and defendants. It is quite possible to reconcile the testimony of defendants' witnesses with the existence of the contract, but it is impossible to reconcile that of plaintiffs' witnesses with its non-existence. Mrs. Keller may have chosen not to satisfy what Mr. Buyck himself described as his "mere curiosity". She may have chosen not to be entirely frank in discussing with Mr. or Mrs. Whetstone a transaction which had admittedly made her favorite niece feel "hard toward both" Myrtis and herself. On the other hand, it would be contrary to human nature for Mrs. Keller to state, again and again, that she had made a *promise* of this nature if such were not the case.

Under the well established rule in this State, the execution of the will must be taken into consideration as bearing on the improbability of the existence of a contract inconsistent with its terms.

The weight to be given to this inference necessarily depends upon the nature and degree of the proof of the contract and all of the attendant circumstances.

Here the bargain was made in August of 1948 and the *inconsistent will* was executed on August 24, 1951. In the meantime Frank McLauchlin had been stricken with an incurable illness. The testatrix had reason to believe that she would survive him. If she had done so, she would have had the clear right to rescind the contract. *Prater v. Prater,* 94 S. C. 267, 77 S. E. 936. She may have considered, perhaps correctly, that she had the right to rescind because of the changed situation wrought by Mr. McLauchlin's illness. But she could not do so without notice to plaintiffs. And these facts are recited, only because they furnish a reasonable explanation for the execution of the inconsistent will.

My satisfaction with the conclusion reached is strengthened by two additional considerations.

In the first place, if this issue had arisen between the parties in Mrs. Keller's lifetime, a denial by her that the devise of the home was included in her proposition to plaintiffs would have been thoroughly discredited by testimony in this record. Plaintiffs would have been competent witnesses to the terms of the agreement and the testimony of the defendants' witnesses, Mr. and Mrs. Whetstone, Mr. Buyck and Mrs. Ada McLauchlin, would have been incompetent. Manifestly, the death of Mrs. Keller has handicapped, rather than assisted plaintiffs in proving the existence of the contract.

Secondly, the recurrent refrain in the testimony is that Mrs. Keller's prime motive in making this arrangement was to secure herself against being alone in her home should she

become helpless in her old age. Some such agreement as that claimed by plaintiffs was reasonably calculated to fulfill this dominant purpose and desire. The promise of substantial reward at the end of her days would tend to keep plaintiffs with her when the burden on them should become more arduous. Under all of the testimony, it is much more reasonable to believe that testatrix proposed an arrangement which was at least conducive of permanency than that she proposed one which was not.

For the reasons stated, and as already indicated, I conclude that plaintiffs have established the existence of the contract by testimony which meets the stringent requirements of the law in cases of this kind.

(2) Have Plaintiffs Performed the Contract on Their Part?

This issue, although raised by the pleadings, is not seriously contested in the evidence. The only reasonable inference from the testimony is that plaintiffs fully performed their part of the agreement to the satisfaction of testatrix. While defendants argue that specific performance should be refused as a matter of discretion because the services required of or performed by plaintiffs were slight as compared with the value of the reward claimed, no issue as to the fairness of the contract is raised by the pleadings. Since the nature and extent of performance by plaintiffs will necessarily be discussed in connection with the defense of the Statute of Frauds, no further comment thereon will be made here and this question is resolved in favor of plaintiffs.

(3) Is the Action Barred by the Statute of Frauds?

Admittedly the contract rests in parole and its enforcement would be barred by the Statute of Frauds if it were wholly executory. But here plaintiffs accepted the proposal made to them by testatrix in August 1948 by moving into the apartment. During the next three years they continued to reside there in conformity with the

agreement and performed every service required or requested of them by Mrs. Keller.

It was never contemplated that they should become her servants. She was well supplied with these. But she wanted the comfort and security of having congenial members of the family under her roof, someone on whom she could call, especially at night, should the necessity arise. Although she had other friends and relatives with whom she sometimes chose to go to various places, she did not wish to be dependent upon them. She wanted Myrtis to be available as a companion and driver to take her wherever she requested. She wanted above all, in my opinion, the peace of mind which comes of knowing that she had a permanent arrangement which would provide her with companionship and assistance if she should become helpless.

The plaintiffs fulfilled these conditions. That in Mrs. Keller's mind their services to her were referable to a contract is abundantly shown by her statements to numerous witnesses for both plaintiffs and defendants. In addition to testimony already commented on she, in effect, told Charlotte McLauchlin Whetstone that she had given Myrtis permission to look for a job after Frank returned from the Charleston hospital.

That plaintiffs likewise considered performance of these conditions to be a matter of obligation is also shown. Myrtis was cheerful and prompt in responding to her summons. When Frank was in the hospital in Orangeburg from June 25th to August 10th, 1951, she tried to fulfil her obligation to both by returning to the apartment every night, although her husband probably needed her attention. That she did so out of consideration for Mrs. Keller is at least strongly indicated by the fact that when she later spent about two weeks with Frank in a Charleston hospital, she arranged to have her son and his bride move into her apartment so that Mrs. Keller would not be left alone.

When Mrs. Keller died on March 21, 1952, after approximately three years and seven months of compliance by plaintiffs, the contract became fully executed on their part. Under these circumstances, our Supreme Court has consistently (with perhaps one exception in modern times, see *Brown v. Golightly,* 106 S. C. 519, 91 S. E. 869, recognized (albeit the rule has been seldom applied because of the court's dissatisfaction with the proof in most cases of this nature coming before it) that the Statute is not a bar to specific performance. This is especially true where, as here, neither the legal benefit to the promisor nor the legal detriment to the promisee is susceptible of reasonably accurate pecuniary measurement and the parties never intended that they should be thus measured.

In *White v. McKnight,* 146 S. C. 59, 143 S. E. 552, 553, 59 A. L. R. 1297, Mr. Justice Cothran, who never spared himself in the exploration of precedent, expressed the view that the proposition quoted below was too "well settled to require the citation of authorities. * * *

"That, notwithstanding the statute of frauds, the *specific performance* of such a contract (to devise real property, interpolated) may be enforced *in equity,* where there has been part performance of the contract by the party seeking relief."

This rule has sometimes been placed upon the ground that if claimants have performed their part of the agreement, it would be a fraud on their rights to permit a testator or his devisees to repudiate it. *Turnipseed v. Sirrine,* 57 S. C. 559, 35 S. E. 757.

It has also been said that the promisee is entitled to the relief demanded because upon performance of his part of the agreement he becomes the equitable owner of the property in question. *Fogle v. St. Michael Church,* 48 S. C. 86, 26 S. E. 99.

In *Kerr v. Kennedy,* 105 S. C. 496, 90 S. E. 177, 178, where recovery was denied on other grounds, it was said:

*"There is no doubt* that a contract of the character alleged in the pleadings in this case (to devise real estate in exchange for services, interpolated), when it is fully established by clear and convincing proof *and has been performed by the party asking relief,* will be enforced by a court of equity."

Able counsel for defendants contend that the right to specific performance of an oral contract to devise real estate, even after performance of the contract by the promisee, is very much more circumscribed than is indicated in the above quotations. Suffice it to say that the applicability of the rule adduced, where performance by the claimant was of the same general character as that reflected by the evidence here, has been recognized by the Supreme Court of this State in too many cases for it to be denied in this Court. In numerous cases of claimed oral contracts to devise in consideration of living with and rendering services to promisor, recovery has been denied because of inadequacy of the proof to establish either the existence of the contract or its performance by the promisee. I have found none, unless it be the Golightly case, *supra,* in which, these two essentials having been established, relief was denied because of the bar of the Statute.

For a comparatively recent case in which it was held that the Statute did not bar recovery under circumstances somewhat similar to those appearing here, see *Baylor v. Bath,* 189 S. C. 269, 1 S. E. (2d) 139.

### Questions of Evidence

The Special Referee treated as competent the testimony of F. Buyck McLauchlin and Lawrence McLauchlin, which was objected to by defendants upon the ground that they were interested parties within the meaning of Section 26-402, Code of 1952. The position taken was that the interest of these nephews of testatrix in the residuary estate would be protected against a possible claim for services if plaintiffs should prevail in this action. The authority relied upon is *Roe v. Harrison,* 9 S. C. 279.

The objection has probably been waived. However, I think that the witnesses were competent. The language relied upon from the *Roe case,* when considered in the light. of the opinion in *Riddle v. George,* 181 S. C. 360, 187 S. E. 524, must be construed to mean that a witness is disqualified only when there is a possibility that his interest may be affected by "the direct legal operation and effect of the judgment." The possibility on which the objection was based falls without the rule.

The Special Referee likewise treated as competent the testimony of certain of defendants' witnesses as to statements made by Mrs. Keller which were objected to on the ground that they constituted self-serving declarations. These objections have been reserved by exceptions. With the probable exception of the conversation related by Mrs. Ada McLauchlin, which took place after the execution of the inconsistent will, I think that the objections were properly overruled. To establish their case, plaintiffs relied upon testimony as to statements made by Mrs. Keller during and before the period of performance. Of necessity, the weight and sufficiency of this testimony should be tested in the light of other statements made by her during the same period. Conceivably the tendency of one statement by a person since deceased to establish a contract might be rebutted entirely by amplification or explanation in another statement. It would be a dangerous rule which, under the circumstances appearing here, admitted the one and excluded the other.

The plaintiffs before the Special Referee sought to require production by Honorable L. M. Gressette of copies of certain former wills of Mrs. Keller which he had prepared as her attorney. Defendants objected principally upon the ground that to require production of these copies would violate the rule of privilege as to confidential communications between attorney and client.

Under circumstances which will be disclosed by the record, these copies were produced before me so as to give

plaintiffs an oportunity to make an offer of proof, subject however to all objections previously made to their admissibility. These prior wills made no reference to a contract and have not been considered by me in deciding that one did exist. It is, therefore, unnecessary for me to pass upon the interesting and difficult question of whether their production was compellable.

The issues upon which their right to the relief sought having been resolved in favor of plaintiffs; and the one-half undivided interest of W. Frank McLauchlin in the property described in the complaint having been inherited by the plaintiff, Myrtis McLauchlin, and the substituted plaintiff, W. Frank McLauchlin, Jr., in equal shares:

It is ordered, adjudged and decreed:

1. That the said Myrtis McLauchlin is now the equitable owner of an undivided three-fourths interest in the real estate described in the complaint in this action, and that the said W. Frank McLauchlin, Jr., is the equitable owner of a one-fourth undivided interest therein.

2. That the defendants, L. Marion Gressette, Ernest Whetstone, L. M. Able, Cecil Smoak and B. S. Robinson, as Trustees of the First Baptist Church of St. Matthews, South Carolina, do, within twenty days after written notice of the filing of this Decree, make, execute and deliver to the Clerk of this Court a deed conveying in fee simple the property described in the complaint to the said Myrtis McLauchlin and W. Frank McLauchlin, Jr., as tenants in common in the proportions above set forth; and the said Clerk, upon their demand therefor, shall deliver the said deed to the grantees.

November 12, 1953.

PER CURIAM.

We have studied the record in this case, and find ourselves in agreement with the result of the Order therein of the learned Circuit Judge.

Let the said Order, after the orthographic errors and misnomers appearing therein (which have been pointed out to the Clerk of this Court) are corrected, be published herewith.

Affirmed.