495 S.E.2d 222

**James W. WRIGHT, Jr., Respondent,**

**v.**

**Neil W. TRASK, Appellant.**

**No. 2761.**

Court of Appeals of South Carolina.

Heard Nov. 5, 1997

Decided Dec. 8, 1997.

172

Harold P. Threlkeld, Anderson, for appellant.

Joseph G. Wright, III, of Wright & Trammell Law Firm, Anderson, for respondent.

HOWELL, Chief Judge:

James W. Wright, Jr. brought this action for breach of an oral contract to make a will and for damages against his grandfather, Neil W. Trask. Trask counterclaimed, seeking pendente lite relief for the return of business records, a declaratory judgment over ownership of cattle, an accounting for sale of cattle, an order requiring Wright to return or share all farm equipment, and an injunction prohibiting parties from selling cattle, property, machinery and equipment during the pendency of the action. By agreement of the parties, the matter was referred to a master-in-equity with the issues at the hearing limited to breach of contract to make a will or, in the alternative, for quantum meruit. The master ordered Trask to specifically perform the contract to will by executing and not revoking a will devising the cattle ranch, all of the equipment, and all livestock to Wright and enjoined Trask from alienating, encumbering or disposing of any of the real estate. The master further ordered that Wright return as ranch manager and that he place all proceeds of the ranch into an account for payment of Trask's and the ranch's expenses. Trask appeals the master's order. We affirm.

### I.

In 1938, Trask bought a large ranching operation in Abbeville County, on which he began breeding registered Polled Hereford cattle. Trask bought the ranch with the long-range goal of producing three generations of improvement in breeding the cattle. According to everyone close to him, Trask was passionately consumed with finding someone to continue his work.

In 1983, when Trask was eighty-three, he approached his grandson, Wright, who had helped on the ranch since he was young, about continuing his legacy on the ranch. At the time, Wright was working at his father and uncle's meat packing business with his stepbrother, George Rodgers. Wright and Rodgers planned to buy into the thriving business and to eventually take it over. Although the initial pay for managing

Trask's ranch was meager at first, Wright felt such a strong affection for Trask's ranch that he quit his job with his father's business and moved his family to the ranch.

In 1983, when Wright took over, the ranch covered 3,200 acres and had approximately 700 cattle, most of which were registered Polled Herefords. The ranch was beginning to show its age. In fact, the Polled Hereford Association had threatened to invalidate the registration of Trask's ranch because of a possible tainted pedigree among the cows, due to bulls breaking through fences during the mating season. Managing the ranch became more than a full time job for Wright, and he sometimes labored from sunup to sundown, seven days a week.[1] Wright worked to replace eleven to twelve miles of the perimeter fence and five to six more miles of cross fencing. In addition, Wright built a ranch house and hay barn and tore down decrepit buildings. Wright also worked with his grandfather to learn from experience what it took to enhance the herd.

As Wright demonstrated his proficiency at managing the ranch, Trask began plans to leave the ranch to Wright. On November 27, 1985, Trask executed a will leaving his share in the ranch to his wife Amie Trask. If Trask's wife predeceased him, 60% of his stock in the ranch was to go to Amie Trask Wright, who is Wright's mother and Trask's daughter, and the remaining 40% to Wright. According to the terms of the will, Wright was to take the ranch machinery and the cattle, except for up to 25% of the herd that was to be used to pay estate taxes if Trask survived his wife. Amie Trask executed a will with reciprocal provisions to Trask's will. Amie Trask died in August 1989. On December 1, 1989, Trask executed a new will leaving Wright his interest in the ranch, which consisted of all of his real estate in Abbeville County and all of the vehicles, machinery, and equipment used in the ranching operations. Trask's new will also gave Wright the right to choose 200 cattle. On December 28, 1989, Trask revised his will again by increasing the devise of cattle to Wright's selection of 300 cows, 80 heifers and 60 bulls from the ranch. On May 2, 1991, Trask made another revision to his will in

---

1. From 1983 until 1996, Wright took only one week-long vacation.

which he left all of the cattle to Wright, in addition to all of the land and equipment.

In 1994 Trask suffered a stroke. With Trask weakened by his age and his stroke, the demands on Wright and his wife, Susan, dramatically increased. Susan, a registered nurse, felt obligated to attend to Trask's every need. Attempts to hire sitters to take care of Trask were often rebuffed by Trask, resulting in Wright and Susan having to stay with Trask on nights and weekends.

As Trask's health declined, Wright assumed almost complete control of the ranch. Some of Wright's decision did not sit well with his fiercely independent grandfather, and the disputes which lead to this controversy arose: First, to help defray some of Trask's increased living expenses and the low price on cattle, Wright began leasing hunting rights on some of the wooded areas of the ranch to deer hunters. Trask decided he did not like leasing the hunting rights and accused Wright of not sharing the hunting proceeds. Next, Trask complained of Wright leaving him out of the decision-making process when Wright stopped leasing a 200 acre tract of land from the Simpsons, Trask's other daughter's family. Finally, Trask became angered when Wright sold a cow and calf which Trask considered to be among his best.

Relations between grandfather and grandson became so strained that in early 1996, the ninety-six year old Trask fired Wright and changed his will to completely disinherit Wright. Sadly, Trask and Wright could not overcome their differences and Wright sought judicial relief in March 1996. The master found in favor of Wright, and Trask appeals the decision to this court. Trask alleges the master erred by (1) finding the existence of an oral contract to make a will, (2) holding that the oral contract to make a will was not statutorily void, (3) granting specific performance, and (4) ruling on the ownership of cattle and equipment.

## II.

Trask argues that Wright did not prove the existence of an oral contract to make a will by definite, cogent, clear, and convincing evidence. We disagree.

■ An action for specific performance of a contract to make a will is an action in equity. *Wright v. Patrick,* 262 S.C. 434, 205 S.E.2d 175 (1974); *Kerr v. Kennedy,* 105 S.C. 496, 90 S.E. 177 (1916). "Because this is a proceeding in equity, we have the authority to find the facts based on our own view of the preponderance of the evidence. However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a position to judge their credibility." *Alala v. Peachtree Plantations, Inc.,* 292 S.C. 160, 162, 355 S.E.2d 286, 287 (Ct.App.1987) (citations omitted).

■ A pre-Probate Code contract to make a will [2] may be written or oral, but must have the essential elements of any contract, which are: a contractual intent, an actual meeting of the minds of the parties, and valid mutual consideration. *Caulder v. Knox,* 251 S.C. 337, 344, 162 S.E.2d 262, 266 (1968). Because a contract to make a will is irrevocable, a person attempting to enforce a contract to make a will faces a heightened burden of proof. *Kerr,* 105 S.C. at 501, 90 S.E. at 178. Contracts to make a will "are regarded with suspicion and will not be sustained unless established by definite, clear, cogent and convincing evidence." *Brown v. Graham,* 242 S.C. 491, 493, 131 S.E.2d 421, 422 (1963).

■ Wright introduced a host of witnesses who testified about his agreement with Trask. In *Hayes v. Israel,* 242 S.C. 497, 131 S.E.2d 506 (1963), the South Carolina Supreme Court held:

> Absent an express provision in the will that it was executed pursuant to contract, proof of testamentary contract may be supplied by competent witnesses who testify to admissions of the testators or such proof may result as an implication from the circumstances and relations of the parties and what they have actually provided in the instrument.

*Id.* at 500, 131 S.E.2d at 507. Wright's family stated Trask clearly told Wright that he would leave him the ranch if Wright worked as the manager. Amie Trask Wright testified her father told the family he was going to give Wright the land and the cattle, if Wright devoted all of his energy and

---

**2.** For more detailed discussion of the effect of the Probate Code on oral contracts to make a will, see the next section.

time to carrying on the cattle. George Rodgers stated that at many family gatherings he heard Trask express that he looked forward to Wright managing the ranch and he was leaving the ranch, cattle, and equipment to Wright in return for Wright's service at the ranch. Leith Wright Fitzpatrick, who is Trask's granddaughter and Wright's sister, testified she was at her parents' house when Trask offered Wright the ranch, land, and equipment in exchange for Wright leaving the meat packing plant and coming to run the ranch. Susan Wright, Wright's wife, testified Trask told Wright "that if [Wright] would quit [his job], sell his cows, and come down and devote himself to [Trask's] cows and learning the cattle and learning how to register and carry them on that [Trask] would see to it that [Wright] got the cattle and the land to run them on and the machinery to do it with."

More convincing, however, were the non-interested witnesses who confirmed Trask told them of his agreement with Wright. *See McLauchlin v. Gressette*, 224 S.C. 296, 79 S.E.2d 149 (1953) (giving strong consideration to disinterested witness who testified about an oral contract to make a will). Trask's business colleagues testified Trask told them he was going to leave the ranch to Wright in exchange for Wright serving as the manager. Pat Wilson, a friend and fellow cattleman, stated Trask told him on numerous occasions, beginning when Wright first came to work for him, that he had found someone who would carry on the work at the cattle ranch in his tradition. Mel Gerrard, a real estate businessman and acquaintance of Trask, said Trask told him if Wright managed the ranch, then Trask would leave the ranch and cattle to Wright, so he could carry on the line of cattle. Jake Von Cannon, a friend of Trask for fifty years, drove of his own volition from Missouri to testify in this case. The pertinent part of Von Cannon's testimony went as follows:

Q. Okay. So as far as the agreement between Mr. Trask and [Wright], what did you understand that agreement to be?

A. I understood that agreement to be that [if Wright] ran the ranch, the ranch would be [Wright's], the ranch and that meaning the cattle, too. I suppose the equipment. The equipment was never mentioned specifically, but [Trask] was always concerned about continuing his herd.

Wright also produced the testimony of Trask's employees. Attorney Richard Otter, who represented Trask for over ten years, stated his understanding of the agreement was if Wright operated and maintained the ranch in the proper manner, Trask would will Wright the land, equipment, and machinery of the ranch. Otter made his assumption from discussions he had over the years with Trask and Wright and from the wills he prepared for Trask. Helen Frances Gilliland,[3] a sitter for Mr. Trask starting December 24, 1995, testified Trask often mentioned Wright and how he planned for Wright and Wright's son, Cameron, to carry on the ranch. Trask told her he had left the ranch, the cattle, and the equipment to Wright because Wright ran the ranch. Gertrude Kay, another sitter, testified Wright came to visit Trask almost every day before the falling out. Kay stated Trask told her he was going to give Wright the land and some cattle to carry on the ranch in exchange for Wright running the ranch. Bernice Calhoun, who had cooked and cared for Trask since 1986, testified Trask told her he wanted Wright and Wright's son to run the ranch and carry on the cattle, and if Wright did this, Trask would give the land and everything with the ranch to Wright. Calhoun also stated that Trask expressed regret about changing the will to disinherit Wright. Charlie Smith, who used to work for Trask, testified Trask told him he was leaving Wright the ranch if Wright would run it until Trask's death. Fredrica Smith, Charlie's wife, testified Trask told her Wright was the only one he trusted with the ranch and when he died he hoped Wright would take the ranch and cattle.

In addition to the testimony of witnesses, Wright also introduced other evidence of his agreement with Trask. "The intention of the parties should be determined from the surrounding circumstances, as well as from the testimony of all the witnesses; and subsequent acts are relevant to show whether a contract was intended." *Caulder*, 251 S.C. at 345, 162 S.E.2d at 266. Wright introduced evidence that Trask had already begun the process of transferring the ranch into Wright's name. For example, Trask contacted the American

---

**3.** Gilliland testified despite the fact that Trask threatened to fire any of his sitters who did not testify in his favor in this dispute.

Polled Hereford Association to change the name of the breed-
er account to Trask Ranch with the names of Neil W. Trask
and/or J.W. Wright as owners. Similarly, in the late 1980's,
Trask began placing the ranch equipment in Wright's name.
In addition, during the period from 1983 to 1994, Trask gave
Wright approximately 100 cattle, valued from $500 to $3,000 a
head.

Finally, Wright attempted to show that his salary was lower
than is customary in the ranching business, evidencing that he
accepted the low pay because he anticipated the larger future
reward which Trask promised. Teddy Gentry, an expert in
Polled Hereford ranching operations who was familiar with
the Trask ranch, testified a fair compensation for the manager
of this size ranch would be in the upper end of a $45,000 to
$75,000 per annum range and would include housing, utilities,
insurance, and transportation. In addition, Pat Wilson, who
runs a smaller ranch with less cattle than Trask, stated he
pays his Hereford ranch manager a total compensation pack-
age equivalent to $50,000 per annum. To contrast the other
ranch managers' compensation packages, Wright testified that
when he began working at the ranch, Trask paid him only
$900 a month in salary, with a rent-free house and a vehicle.
Within a year, Trask increased Wright's salary to $1500 a
month, but Wright had to move out of the house because it
belonged to the Simpson side of the family. Thereafter, Trask
no longer paid Wright's housing expenses.

We believe Wright proved the existence of a contract to
make a will by definite, clear, cogent and convincing evidence.
The only testimonial evidence Trask offered was his own bold
denial of any agreement. Trask attempts to supplement his
denial by asserting that any declaration which he may have
made to Wright did not effectively relinquish his testamentary
power. To support his argument that he retained his testa-
mentary prerogative, Trask pointed to the wills which he
made until 1991, which did not exactly comport with his
alleged agreement with Wright. After considering the over-
whelming testimony of the witnesses and the compelling cir-
cumstantial evidence, however, we are certain Trask did relin-
quish his testamentary power in 1983. *See Footman v. Sweat,*
247 S.C. 172, 178, 146 S.E.2d 624, 627 (1966) (holding a will
which was contrary to the alleged oral contract to make a will

"does not of itself determine that such an agreement has not been made"). Trask's subsequent wills which did not mirror his agreement with Wright were simply breaches of the agreement for which Wright could have sought redress. Thus, we hold the master did not err in finding Trask and Wright made an agreement that if Wright would manage the ranch, Trask would leave the ranch, the cattle, and the ranch equipment to Wright.

## III.

Trask argues any oral contract to make a will is barred by the South Carolina Probate Code and by the Statute of Frauds. We disagree.

### *A.*

Wright readily admits the oral contract to make a will does not meet the legal requirements of Probate Code section 62–2–701.[4] However, section 62–2–701, along with the rest of the Probate Code, only became effective on July 1, 1987. Section 62–1–100(4) specifically states that the Probate Code does not apply to "an act done before the effective date in any proceeding and any accrued right is not impaired by this Code." S.C.Code Ann. § 62–1–100 (Supp.1996).

Wright contends he and Trask entered into the oral contract to make a will in 1983, thereby barring the application of the Code. Wright presented several family members who testified Wright took over management of the ranch in 1983 because of an agreement with Trask that Wright would inherit the ranch. Wright's mother described a meeting at her house in September of 1983 where Trask and Wright reached an agreement concerning the management and inheri-

---

4. S.C.Code Ann. § 62–2–701 (Supp.1996), states:

A contract to make a will or devise, or to revoke a will or devise, or not to revoke a will or devise, or to die intestate, if executed after the effective date of this act, can be established only by (1) provisions of a will of the decedent stating material provisions of the contract; (2) an express reference in a will of the decedent to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract and extrinsic evidence proving the terms of the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.

tance of the ranch. Susan Wright, George Rodgers, and Leith Fitzpatrick all related similar stories of family meetings in 1983, where Trask discussed his arrangement with Wright.

Trask does not attempt to refute the testimony of Wright's witnesses, but attempts to bring the action within the realm of the Probate Code by arguing that the will containing the agreement was not published until 1991—after the effective date of the Probate Code. Trask's argument is flawed, however, because the 1991 will did not create Wright's interest in the ranch. Wright's interest in the ranch resulted from his 1983 agreement with Trask. We believe that rights arising out of an oral contract to make a will done before the advent of the Probate Code is exactly the type of case which section 62–1–100 excludes from the new Probate Code's provisions. Therefore, section 62–2–701 of the Probate Code does not apply to this case.

## B.

Trask also argues the Statute of Frauds, S.C.Code Ann. § 32–3–10 (1991),[5] bars enforcement of the oral contract, because the alleged contract was not in writing. We disagree.

The South Carolina Supreme Court in *McLauchlin v. Gressette*, 224 S.C. 296, 79 S.E.2d 149 (1953), dealt with a situation very similar to this case. In *McLauchlin*, Lula Keller promised her nephew, Frank McLauchlin, and his wife that if they moved in with her until her death, she would convey her house to them in her will. Despite the fact the McLauchlins lived with her for over three and a half years until her death, Keller devised her home to the First Baptist Church of St. Matthews.

---

**5.** S.C.Code Ann. § 32–3–10 (1991), states:

No action shall be brought whereby:
(1) To charge any executor or administrator upon any special promise to answer damages out of his own estate;

. . . . .

(4) To charge any person upon any contract or sale of lands, tenements or hereditaments or any interest in or concerning them; or
(5) To charge any person upon any agreement that is not to be performed within the space of one year from the making thereof;
Unless the agreement upon which such action shall be brought or some memorandum or note thereof shall be in writing and signed by the party to be charged therewith or some person thereunto by him lawfully authorized.

In an action by the McLauchlins to enforce the terms oral contract to make a will, the church defended by arguing the oral contract to make a will violated the Statute of Frauds. The supreme court stated, "That, notwithstanding the statute of frauds, the specific performance of such a contract (to devise real property, interpolated) may be enforced in equity, where there has been part performance of the contract by the party seeking relief." *Id.* at 316, 79 S.E.2d at 158; *see also Kirkpatrick v. Kirkpatrick,* 223 S.C. 357, 75 S.E.2d 876 (1953).

■ Applying the holding of *McLauchlin* to this case, we conclude that as long as Wright performed his end of the contract—managing the ranch—the Statute of Frauds does not apply. The record is replete with references to the good job Wright did in managing the ranch for over twelve years. Trask unabashedly boasted to his friends and colleagues about Wright's proficiency at managing the ranch. Pat Wilson testified that Wright maintained a well-managed and well-bred Polled Hereford ranch. Similarly, Trask's friend, Mel Gerrard, said that in the spring of 1994 Trask told him Wright was doing an excellent job and Trask said Wright was the best manager he ever had at the ranch. Finally, Jake Von Cannon remembered when Wright began managing the ranch the fences were in considerable disrepair but Wright diligently fixed them. Von Cannon also stated Trask told him on numerous occasions he was pleased with the job Wright was doing and he intended to leave the cattle and the ranch to him. Finally, Trask even admitted Wright "did a splendid job" as manager of the ranch. We, therefore, hold that Wright successfully performed his part of the bargain.

■ Trask, however, contends that Wright breached any agreement which they may have had by improperly leasing hunting rights and then not sharing the profits, refusing to lease the Simpson tract, and improperly selling Wright's cattle. Wright provides a more than adequate explanation for each allegation. First, Wright responded to the allegations he was making a secret profit from the deer hunting revenues by explaining that he used the proceeds from the hunting leases to pay for a tractor, to repair fencing, and to build a cabin. To support his contention, Wright offered the testimony of Ann Williams, who kept the books for the ranch. Wilson testified she never noticed any impropriety in the books and records

kept by either Wright or his wife. In addition, Wright said that when he first told Trask about the plan to lease the land to deer hunters, Trask did not express any reservations or complaints. Second, Wright explained the excess land leased from the Simpsons was not only unnecessary but was also a liability. Wright believed the 3,200 acre ranch was sufficient to support the cattle without the added $5,000 a year rent for the 200–acre Simpson tract. Moreover, cattle were escaping from the Simpson tract because the fences on the Simpson tract were in disrepair. In fact, Trask's insurance policy was canceled after a cow escaped from the Simpson tract and was hit by a car, causing over $190,000 in damages. With Trask's insurance canceled, Wright was forced to obtain insurance in his own name. Finally, the cow and calf that Trask complained Wright sold belonged to Wright. Wright testified Trask gave him the cow years ago and the calf was her offspring. Trask even admitted, "To the best of my knowledge, every animal that was purchased after [Wright] came there I gave ownership and transferred the ownership to him." The record also reflects that Trask was always reluctant to sell his cattle and would often renege on a deal when selling cattle, even when the purchaser was a friend. Therefore, we do not find that Wright breached the agreement to manage the ranch.

Thus, we hold that Wright's performance of the agreement removes the oral contract to make a will from the Statute of Frauds and that Wright did not breach the agreement.

## IV.

Trask contends that because Wright had an adequate remedy at law, the master erred in decreeing specific performance. We disagree.

"The usual remedy afforded the beneficiary of the contract to make a will is an action for specific performance." Coleman Karesh, *Wills* 56 (1977); *see* 1 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 10.30 at 504 (Rev. ed. 1960) ("If promisor has entered into a valid contract to devise or bequeath property and dies without leaving a valid will in accordance with the terms of the contract, equity will grant relief to the promisee. . . . This is often spoken of as specific performance."); George W. Thompson, *Thompson on Wills* § 16 at 28 (2nd. ed. 1936) ("If a testator revoke his

will made in pursuance of his promise to make same, his estate will be liable for the breach. . . . Such remedy is sometimes spoken of as specific performance."). The evidence clearly established that Trask and Wright entered into an oral contract to make a will. Trask breached the contract by executing a new will, which did not leave the ranch, the cattle, and the equipment to Wright. We hold that given Wright's faithful dedication to the ranch for over a decade, the master properly granted Wright specific performance of his agreement with Trask. *Cf. Flowers v. Roberts,* 220 S.C. 110, 66 S.E.2d 612 (1951) (holding that specific performance of a contract to make a will is within the sound discretion of the court).

## V.

Trask asserts the trial court erred in deciding the ownership of certain cattle because the parties agreed to limit the issue before the master to only breach of contract to make a will or, in the alternative, for quantum meruit. We hold the master did not err.

Trask complains that the master's order erroneously included the following references to the ownership of cattle:

During January 1996, [Trask] became upset with [Wright] for selling a registered cow and calf. Initially, [Trask] thought that the cow and calf were owned by Trask Ranch, but he later discovered, and now admits, that these were owned by [Wright].

It is apparent that the primary source of discontent on the part of [Trask] is that [Wright] sold cow number 61 and calf number 6 which [Trask] discovered after this action was filed were owned by [Wright].

First, we do not agree the master ruled on the ownership of the animals. Apparently, the master merely recounted Trask's trial testimony. Second, even if the master's statements constituted a ruling, the master did not overstep the agreed limitation. The ownership of cow sixty-one and calf six was pertinent to the breach of contract issue, which Trask raised as a defense. Trask specifically admitted the issues before the master not only included those raised by Wright, but also "the defenses related thereto." Because Trask alleged Wright breached the contract to manage the ranch when he sold the best cows, the master was justified in deciding who

owned the cows which Wright sold. Finally, Trask does not argue, nor do we find, he was prejudiced by the master's ruling. In *GTE Sprint Communications Corp. v. Public Service Commission of South Carolina*, 288 S.C. 174, 341 S.E.2d 126 (1986), the South Carolina Supreme Court held, "Where a party shows no prejudice, the error, if any, is harmless." *Id.* at 181, 341 S.E.2d at 129. Therefore, the master did not err in his statements concerning cow sixty-one and calf six and, even if there was an error, Trask did not allege the error was prejudicial.

## VI.

For the foregoing reasons, we hold Wright proved by definite, cogent, clear, and convincing evidence that he and Trask entered into an oral contract to make a will, the oral contract to make a will was not barred by the Probate Code or the Statute of Frauds, specific performance was a proper remedy for breach of the contract to make a will, and commenting on the ownership of certain cattle was not inappropriate. Therefore, the decision of the trial court is

**AFFIRMED.**

CURETON and HOWARD, JJ., concur.