## 20120

R. E. HUGHES, Respondent, v. Honorable James B. EDWARDS, Governor of the State of South Carolina, et al., Appellants.

(220 S. E. (2d) 231)

*Daniel R. McLeod, Atty. Gen., M. Elizabeth Crum, Asst.
Atty. Gen.,* of Columbia, *and Messrs. Sinkler, Gibbs, Simons*

*& Guerard,* of Charleston, *for Appellants,* cite:

*Messrs. Leatherwood, Walker, Todd & Mann,* of Greenville, *for Respondent,* cite:

*Messrs. Phillip M. Grier, and Timothy G. Quinn,* of Columbia, *Amicus Curiae,* cite:

December 3, 1975.

*Per Curiam:*

This, a taxpayer's action, was instituted against the State Budget and Control Board of South Carolina, seeking an interpretation of § 20B of the General Appropriation Act of the General Assembly for the year 1975-76. The taxpayer has asked the Court to enjoin the Board from borrowing money and pledging the credit of the State by issuance of certain bonds. From an order granting the injunction, the Board has appealed.

A study of the record and the briefs reveal that the order of the lower court sets forth and properly disposes of all of the exceptions raised in the appeal to this Court. The order of the Honorable Joseph R. Moss, Special Judge, shall be printed as the directive of this Court.

Rhodes, J., not participating.

## ORDER OF JUDGE MOSS

In this taxpayer's suit the plaintiff, R. E. Hughes, seeks to enjoin the State Budget and Control Board from approving the issuance of Capital Improvement Bonds contrary to what he contends is the meaning of Section 20B of the General Appropriation Act for the fiscal year 1975-76. Section 20B is an amendment to Section 4 of Act 1377 of 1968 and reads in pertinent part as follows:

"The Budget and Control Board is hereby directed to regulate the issuance of General Obligation Bonds now and hereafter authorized by the General Assembly so that annual debt service requirements, excluding such requirements for highway bonds and institution bonds, will not exceed five per cent of general fund revenue of the last completed fiscal year. Provided, however, that this directive shall not be effective so long as requirements for currently outstanding bonds exceed five per cent and provided, further, that for the fiscal year 1975-76 the directive may be waived if necessary to the extent that bond issues beyond the five per cent limitation may be necessary to finance projects or purposes now under contract."

## THE FACTS INVOLVED

In 1968, when the Capital Improvement Program for the State of South Carolina commenced, the total amount of bonds authorized thereunder was $70,000,000. By 1975 that figure exceeded $500,000,000. This tremendous increase in the outstanding bonds necessarily brought about a tremendous increase in the debt service requirements for such bonds. The general financial condition of the country worsened perceptibly, and the largest City in the country was faced with a threatened default in its bond obligations.

For many years the State of South Carolina has enjoyed an enviable position with regard to its bonds. They have been consistently rated AAA, and such has resulted in a

ready market for the bonds of this State at an advantageous price.

In view of the existing financial condition of the general economy and in view of the tremendous increase in the outstanding bonds and the consequent increase in debt service requirements, the General Assembly felt that the issuance of further General Obligation Bonds of the State should be curtailed or restricted so that the debt service requirements for General Obligation Bonds of the State, excluding highway bonds and institution bonds, should not exceed five percent of the general fund revenue for the preceding fiscal year. This restriction, or some such restriction, is certainly wise and plainly shows the intention of the General Assembly to maintain the fiscal integrity of this State.

A number of projects have been approved by the General Assembly prior to June 6, 1975, the effective date of Section 20B of the General Appropriation Act for the fiscal year 1975-76. However, the Budget and Control Board had not specifically authorized the issuance of bonds for such projects, and on September 22, 1975 the Budget and Control Board did meet and did authorize, subject to Court approval, the issuance of $35,384,702.36 of bonds for projects which had been authorized but were not under contract or construction as of June 6, 1975 and an additional $4,436,-301.90 for authorized projects other than construction which were not under contract as of June 6, 1975. Further, the Complaint alleges and the Answer admits that there are additional projects for which the Budget and Control Board will authorize the issuance of bonds if authorized by the Courts.

The general fund revenue for the fiscal year 1974-75 amounted to $841,575,000, and five percent of such general fund revenue amounts to $42,078,000. Debt service requirements for the fiscal year 1975-76 on bonds presently outstanding amounts to $44,241,400 and that, of course, exceeds five percent of the general fund revenue for the fiscal year 1974-75.

## CONTENTIONS OF THE PARTIES

Plaintiff contends that since the debt service requirements for the fiscal year 1975-76 on presently outstanding bonds exceeds five percent of the general fund revenue for 1974-75, the Budget and Control Board cannot approve the issuance of any further bonds unless the issuance of such bonds is necessary to finance projects or purposes "under contract" as of June 6, 1975.

Defendants contend that despite the five percent restriction it might authorize the issuance of bonds during the fiscal year 1975-76 for projects where work thereon had been performed under commitments to third parties even though construction contracts may not have been entered into if the Budget and Control Board determines that the completion of such projects would be to the best interest of the State of South Carolina.

It thus seems clear that the decision in this case hinges upon the meaning of the words "may be necessary to finance projects or purposes now under contract."

Plaintiff contends that unless there was an actual contract for the construction or purpose for which the bonds are sought to be issued as of June 6, 1975, the Budget and Control Board has no discretion in the matter. Defendants contend that enumerable complex situations and problems would arise if the proviso quoted above is construed to literally mean that for bonds to be issued an actual contract must have been executed as of June 6, 1975.

## LEGAL PRINCIPLES INVOLVED

One of the primary rules of statutory construction is that words used in a statute should be taken in their ordinary and popular significance unless there is something in the statute which requires a different interpretation. *Investors Premium Corp. v. South Carolina Tax Commission*, 260 S. C. 13, 193 S. E. (2d) 642; *Martin v. Nationwide Mutual Ins. Co.*, 256 S. C. 577, 183 S. E. (2d)

451; *Hatchett v. Nationwide Mutual Ins. Co.,* 244 S. C. 425, 137 S. E. (2d) 608. An exception to the aforesaid rule of statutory construction is that if the words used have a well recognized meaning in law different from their ordinary and popular significance, then the words are to be presumed to have been used in their legal meaning. *Purdy v. Moise,* 223 S. C. 298, 75 S. E. (2d) 605; *Coakley v. Tidewater Construction Corp.,* 194 S. C. 284, 9 S. E. (2d) 724; *Poole v. Saxon Mills,* 192 S. C. 339, 6 S. E. (2d) 761.

For a contract to arise there must be an agreement between two or more parties. There must be an offer, there must be an acceptance, and there must be a meeting of the minds of the parties involved. *Masonic Temple v. Ebert,* 199 S. C. 5, 18 S. E. (2d) 584; *Lee v. Travelers' Insurance Co.,* 173 S. C. 185, 175 S. E. 429. It would thus appear that for a project or purpose to have been under contract on June 6, 1975 there must have been an offer by one party, an acceptance by the other party, and a meeting of the minds. There can be no contract so long as, in the contemplation of the parties thereto, something remains to be done to establish contract relations. *Insurance Company of North America v. United States,* 159 F. (2d) 699 (4th Cir. 1947).

Does the fact that land may have been purchased for a project or services for a project contracted for make the "project" under contract so as to authorize the issuance of bonds for the construction or completion of the project?

In *Creech v. South Carolina Public Service Authority,* 200 S. C. 127, 20 S. E. (2d) 645, our Supreme Court stated, "The word 'project' in these latter years of State and Federal construction of public works, has a well known and generally recognized connotation which carries the meaning of a planned undertaking, a definitely formulated scheme or proposal." In that case the Court went on to hold that "project", as used in the Public Service Authority enabling legislation, did not include an operating utility plant

but meant a new construction or new facility in the development of natural resources. To the same effect is the decision in *South Carolina Public Service Authority*, 215 S. C. 193, 54 S. E. (2d) 777.

In *People ex rel. San Francisco Bay Conservation & Development Commisson v. Town of Emeryville*, 69 Cal. (2d) 533, 72 Cal. Rptr. 790, 446 P. (2d) 790 (1968), the Court said:

"The dominant theme underlying all generally accepted definitions of the word 'project' is that of a detailed and specific plan prepared in furtherance of a determination to accomplish a certain objective. A determination without a concrete plan is not a 'project' because the means of achieving the ultimate objective are not delineated sufficiently to permit prudent commencement of the enterprise. A plan without a determination is not a 'project' because the operative decision to proceed toward the objective has not been made. Only when that decision has been made and a plan has been conceived in the detail necessary for prudent commencement of physical efforts to achieve the objective does a 'project' come into being."

There the California legislature had enacted a law requiring that permits be obtained from the Bay Construction & Development Commission prior to any diking or filling operations in the San Francisco Bay. A grandfather clause exempted any "project where necessary . . . [other] permit have been obtained . . . and where such diking or filling process has commenced prior to the effective date of this title . . ." The Town of Emeryville was enjoined from proceeding with further diking and filling activities until such time as it obtained a permit from the Bay Construction & Development Commission.

In *McGlohon v. Harlin*, 254 S. C. 207, 174 S. E. (2d) 753, our Supreme Court stated, "The primary rule in the construction of statutes is to ascertain and give effect to the

intention of the Legislature." To the same effect is *Lewis v. Gaddy,* 254 S. C. 66, 173 S. E. (2d) 376.

At 73 Am. Jur. (2d) 468, Statutes, § 319, we find:

"While it has been held that a proviso may add to a statute by implication, it is a general rule of statutory construction that a proviso which operates to limit the application of the provisions of a statute general in terms should be strictly construed and held to include no case not clearly within the purpose, letter, or express terms, of the proviso. This rule is particularly applicable in the case of a remedial statute."

Keeping the foregoing applicable principles of law in mind, I shall now determine what was the intention of the General Assembly of South Carolina in the passage of Section 20B of the General Appropriation Act for the fiscal year 1975-76 and, specifically, what is meant by the proviso allowing a waiver of the prohibition "if necessary to the extent that bond issues beyond the five per cent limitation may be necessary to finance projects or purposes now under contract."

## THE COURT'S CONSTRUCTION
## OF SECTION 20B

The various projects listed in Paragraph VII of the Complaint and the additional projects listed in Paragraph XVI of the Answer were obviously all felt to be worthwhile projects and of benefit to the people of South Carolina since they had all received the necessary governmental approval, and it is not the purpose nor indeed is it the prerogative of this Court to determine the desirability of such projects. It is the duty of this Court to determine whether or not the issuance of General Obligation Bonds to pay for these projects is permissible in view of the provisions of Section 20B.

Faced with declining revenues, extensive inflation, and at least temporary economic recession, the General Assembly

determined, and quite wisely in the opinion of this Court, that it was no longer advisable for the State of South Carolina to continue to issue general revenue bonds to an unlimited extent and without due consideration of the ever increasing burden of debt service requirements. The General Assembly, therefore, determined that no further General Obligation Bonds, excluding highway and institution bonds, should be issued if the annual debt service requirements or the outstanding General Obligation Bonds exceeded 5% of the general fund revenue for the preceding fiscal year.

Section 20B is an absolute prohibition so far as the issuance of General Obligation Bonds are concerned, other than highway and institution bonds, where the debt service of all such bonds exceeds 5% of the general fund revenue for the last completed fiscal year. The General Assembly, however, realized that there were projects already underway where binding contracts had been entered into and which perhaps could be financed in no other way than through the issuance of General Obligation Bonds. Therefore, the General Assembly gave the Budget and Control Board discretion in such circumstances to waive the 5% limitation so far as it might be necessary to finance such projects or purposes under contract as of the time of the adoption of the Act in question. The only discretion granted to the Budget and Control Board by the General Assembly was where in the opinion of the Budget and Control Board the issuance of General Obligation Bonds might be necessary to finance projects or purposes then under contract. No other discretion is apparent in the statute, giving it a liberal or a strict construction. The proviso, however, should and must be given a strict construction. 73 Am. Jur. (2d) 468.

I am of the opinion, and so hold, that if there was a contract for the purchase of land for a project on June 6, 1975, bonds could be issued if "necessary" and if approved by the Budget and Control Board for the purpose of financing such contract. This however, would not

permit the Budget and Control Board to authorize the issuance of General Obligation Bonds for the construction of a building or facility on such land if there was no contract for the construction of such building or facility on June 6, 1975.

I am of the opinion, and so hold, that if there were outstanding architectural contracts for projects on June 6, 1975, General Obligation Bonds, if otherwise permissible and if necessary to finance such architectural services, could be issued in the discretion of the Budget and Control Board. The issuance of such bonds for such purpose because of such architectural contract would not authorize the Budget and Control Board to issue General Obligation Bonds for the purpose of financing the construction of the project for which architectural services had been contracted.

I am of the opinion, and so hold, that if there was a meeting of the minds between the State Agency involved and the contractor on June 6, 1975, even though no written contract had been actually executed as of that date, the Budget and Control Board could in its discretion, if necessary to finance such project, authorize the issuance of General Obligation Bonds under the proviso of Section 20B.

I am of the opinion, and so hold, that a mere lapse of time in a State Agency learning of the provisions of Section 20B would not authorize the issuance of bonds if the project was not under contract as of June 6, 1975.

## THE HOLDING OF THE COURT AS TO SPECIFIC PROJECTS

(1) The contract status of the multi-purpose building for the University of South Carolina—Aiken so far as a construction contract is concerned was not such as would authorize the issuance of General Obligation Bonds in the amount of $1,900,000 or any other sum. Any General Obligation Bonds that might be necessary to pay the unpaid

services of the architect and to pay for a grading and paving contract are within the terms of the proviso and, if otherwise proper, could be authorized by the Budget and Control Board.

(2) The Spartanburg branch of the University of South Carolina library-classroom building was not under contract as of June 6, 1975, and General Obligation Bonds could not be approved by the Budget and Control Board for such purpose. The mere fact that the building is needed does not justify the Court in ignoring the provisions of 20B.

(3) The Francis Marion College Media Center was not under construction contract as of June 6, 1975, and General Obligation Bonds may not be approved by the Budget and Control Board in order to finance construction of such building. If necessary and if otherwise proper, the Budget and Control Board may authorize the issuance of bonds to pay for architectural services under contract as of June 6, 1975. It is unfortunate that some students might be required to transfer to another college in order to complete their course requirements, but this is a small price to pay for maintaining the fiscal integrity of this State.

(4) With regard to the Department of Education's vocational education projects set forth in Paragraph VI(c) of the Answer, the issuance of General Obligation Bonds may be approved by the Budget and Control Board for the 19 projects which were under contract prior to June 6, 1975.

The Court is of the opinion that the Budget and Control Board may not authorize the issuance of General Obligation Bonds to finance the construction of the Horry County project which was not under contract until June 18, 1975, the Lexington County # 3 project which was not under contract until July 10, 1975, and the Georgetown County project which was not under contract until July 21, 1975. If contracts were let for such construction, the letting of these construction contracts after June 6, 1975 can in no way avoid the provisions of Section 20B, and this Court has

no power or authority to change the effective date of such statute.

The action of the Budget and Control Board in authorizing the issuance of General Obligation Bonds for 13 of the projects remaining to be undertaken in the overall statewide program of vocational education is in violation of Section 20B. Apparently the Defendants contend that if there was an outstanding contract for any of the 41 vocational educational projects (19 of which were under contract as of June 6, 1975), then General Obligation Bonds can be issued in the discretion of the Budget and Control Board for the balance of the various projects without regard to the limitation of Section 20B. This would completely nullify the intention of the General Assembly and is not to be done.

(5) With regard to the Cooperative Marine Research Facility, there was a construction contract executed prior to June 6, 1975, and apparently General Obligation Bonds have been issued to finance such construction contract. Defendants admit that no contract for equipping such project was in existence on June 6, 1975 and, therefore, General Obligation Bonds cannot be issued for such purpose. It may seem incongruous to issue bonds for the construction of a building and hold that the issuance of bonds for the purchase of equipment for such project is prohibited, yet that is exactly what the statute does. The wisdom of legislation is for the General Assembly and not for the Court. It may be that the equipment for this facility can be financed through a general appropriation or through some other way, but it cannot be financed through the issuance of General Obligation Bonds.

(6) No General Obligation Bonds can be issued for the construction of the Lake Long project since it was not under contract on June 6, 1975. Apparently land for such project has been purchased and paid for and certain legal fees paid. The acquisition of such land and the payment of such legal fees does not make the project under contract as of June 6,

1975. No especial hardship is apparent here since presumably the State only paid the fair market value of the land involved and the State would still own the land. In more prosperous times or when the debt service requirements have been reduced, then, of course, the land may be used for any appropriate State purpose. The fact that there was a contract with the engineers on April 23, 1975 does not authorize the issuance of General Obligation Bonds for anything other than the payment of such engineers.

(7) The issuance of General Obligation Bonds for the Food Technology Laboratory cannot be authorized by the Budget and Control Board since such project was not under contract as of June 6, 1975. It is apparent from the allegations of Paragraph VI(f) that this project might be financed in some way other than by the issuance of General Obligation Bonds.

(8) The Budget and Control Board may not authorize the issuance of General Obligation Bonds for financing the construction of the Dennis Wildlife Center (Phase II). There was no construction contract for such project on June 6, 1975.

(9) The State Capitol Complex (Phase II, commonly known as Blatt-Gressette Buildings) seems to be a case where all the requisites of a contract were agreed upon prior to June 6, 1975. Bids for construction had been submitted and $4,300,000 of bonds were authorized by Act No. 225 of 1975 on May 30, 1975. The bid was orally accepted and the contractor was advised of such acceptance and of the enactment of the legislation of May 30, 1975. An E-2 form by which the State Budget and Control Board approves the execution of a construction contract was executed on June 4, 1975, and there was a ground-breaking ceremony for construction on June 3, 1975. Although the actual contract was not signed until June 16, 1975, there obviously was a meeting of the minds and the Court is of the opinion that this project could be said to have been "under contract" as of June 6, 1975.

(10) The University of South Carolina projects, including the renovation of the "horseshoe", area of the old campus, the construction of Gambrell Hall and the renovation of the Engineering-Wardlaw Building, were not in this Court's opinion projects under contract as of June 6, 1975. It is contended that because the "fast track" approach for the construction of Gambrell Hall was being utilized this would avoid the prohibition of Section 20B. I do not agree. Defendants contend that using that approach, certain contracts have been let and other contracts have not, and this would result in incomplete buildings and projects. This is not necessarily so since the issuance of bonds is not the only method by which the completion of buildings can be financed. In addition to that, it is only projects or purposes under contract as on June 6, 1975 that avoid the prohibition of Section 20B and Gambrell Hall was not, from the information available to the Court under contract within the meaning of the statute on June 6, 1975.

(11) The Clinical Sciences Building at the Medical University presents an unusual situation in that such building has been under contract for construction for a period in excess of two years. The cost is being paid with State funds and Federal funds. The original project was substantially completed on June 5, 1975 but shortly thereafter the Federal government approved matching funds for a change order which would add two additional floors to this building, along with another floor for the Administration Building. This Court does not believe that the addition of two floors to an already completed building can be said to be only an extension of a project which was under contract as of June 6, 1975. On the contrary, it would appear that the additional two floors to the Clinical Sciences Building and an additional floor for the Administration Building were new projects which were not under contract on June 6, 1975.

(12) The problem with regard to the State Ports Authority with reference to the acquisition of two container

cranes is somewhat complicated. The project was approved by the State Ports Authority in September of 1974 and by the Budget and Control Board on October 19, 1974. Advertisement for bids was first published on November 24, 1974 and were rejected as being too high. Re-advertisement was had on April 15, 1975, and bids were received on June 24, 1975. The State Ports Authority was authorized to enter into the contract on July 25, 1975. Some $4,260,000 is involved in the project, and the construction of the cranes is already underway in Japan. While complications may arise as a result of this situation, the project was obviously not under contract on June 6, 1975, since bids were not received until June 24 and the contract was not entered into until July 25. For the Budget and Control Board to authorize the issuance of bonds for this project would be in violation of the expressed prohibition of the General Assembly. It is said that contracts for the manufacture of these container cranes were authorized by the Defendant because commitments had been made to shipping lines to provide the service of these cranes and without the cranes expensive dock facilities already constructed could not be fully utilized. To allow the issuance of these bonds would be a reasonable exercise of discretion were it within the terms of the statute. It, however, flies directly into the prohibition of the statute, and General Obligation Bonds cannot be issued for such purpose.

It is, therefore, ordered, adjudged and decreed that the Defendants be, and they are, hereby enjoined from authorizing the issuance of bonds for any of the projects set forth above, except bonds for the construction of the State Capitol Complex (Phase II, commonly known as Blatt-Gressette Buildings) and the 19 projects under the Department of Education's vocational education program which were under contract on June 6, 1975.

And it is so ordered.