Ahmad **SADIGHI**, et al., Plaintiffs,

v.

Ali **DAGHIGHFEKR**, et al., Defendants.

No. Civ.A. 298–2648–18.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 4, 1999.

Mark Andrew Mason, The Mason Law Firm, PA, Mt. Pleasant, SC, Anthony E. Forsberg, The Mason Law Firm, Mt. Pleasant, SC, for plaintiffs.

John Allen Massalon, Wills & Massalon LLC, Charleston, SC, John R. Bush, Tampa, FL, for defendants.

## ORDER

NORTON, District Judge.

This action is before the court on Plaintiffs' Motion to Enforce the Settlement Agreement and for Immediate Entry of Judgment Against Defendants.

### I. BACKGROUND

On September 11, 1998, Plaintiffs filed their Complaint against twenty-three Defendants, alleging that Defendants were unlawfully conducting an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations chapter of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961–68 ("RICO"). In addition, Plaintiffs asserted twenty-one other causes of action against Defendants: breach of contract, breach of contract with fraudulent intent, misappropriation of corporate opportunity, statutory wage act violations, tortious interference with contract, quantum meruit, unjust enrichment, rescission of alleged release, breach of fiduciary duty, fraud, civil conspiracy, Title VII violations, intentional infliction of emotional distress, and unfair trade practices. On January 22, 1999, this court granted in part and denied in part Defendants' Motion to Dismiss the Complaint.

After this court denied Defendants' Motion for Reconsideration of its Order and after months of extensive discovery, the parties entered settlement negotiations. On April 29, 1999, Defendants' local counsel, John A. Massalon, delivered a detailed letter to Plaintiffs' local counsel signed by Mr. Massalon and Mr. Feker,[1] indicating the latter's "agreement to settle" on the terms enumerated in the letter. The letter set forth the exact amount and date of payments to be made by Defendants to Plaintiffs in settlement of the Plaintiffs' claims. The letter also set forth provisions regarding the security for settlement payments, the terms of the release, a denial of liability by Defendants, and a provision that Defendants had no duty to apportion the settlement proceeds among the Plaintiffs. The letter also stated that Plaintiffs represented they were the sole parties to receive the settlement money, that there existed no lien or subrogation interest in the settlement proceeds, and it provided that Plaintiffs would indemnify Defendants from the same. Moreover, the letter provided that the "settlement [was] final and binding among the Plaintiffs and the Defendants regardless of any subsequent action by any third party arising from this suit." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The letter proceeded to go into great detail regarding the cancellation of a *lis pendens* Plaintiffs had filed, the preparation of letters to Defendants' business associates who had become aware of the suit, as well as the preparation of stipulations striking certain allegations from the Complaint in connection with the dismissal of the action. The letter went on to provide for the filing of a petition to seal the record, and it stated that "this settlement is final and binding on all parties regardless of the manner in which the court rules on that petition." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The letter required Defendants to provide letters of reference for Plaintiffs Riggins and NeSmith. The parties had reached an agreement as to the exact wording of those reference letters, which was set out in an attachment to the April 29, 1999 letter. The letter also provided that each party would bear its own attorney's fees and costs. Indeed, the letter was so detailed regarding the specifics of the settlement agreement that it even re-

---

1. Mr. Feker is the President and sole share- holder of all of the corporate Defendants.

solved a dispute between the parties relating to a computer Defendants purchased for Plaintiff Sadighi. The body of the settlement letter concluded with the following paragraph:

This letter is intended to memorialize the basic framework of an agreement and it is not intended as a final expression of the terms of the settlement. The exact terms will be expressed in a more comprehensive Settlement Agreement. However, if this letter does not reflect the broad parameters of our agreement, please contact me. Otherwise, please indicate your acceptance of the foregoing terms on behalf of the Plaintiffs by signing in the space below and returning the same to me by facsimile.

(Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The April 29, 1999 letter closed with the following conspicuous sentences in all capital letters directly above the signature lines.

ON BEHALF OF THE PLAINTIFFS, I AGREE TO THE FOREGOING TERMS IN FULL, FINAL AND COMPLETE SETTLEMENT OF THE PENDING CLAIMS IN THIS MATTER

_____ _____
Mark A. Mason, Esquire Date

ON BEHALF OF THE DEFENDANTS, I AGREE TO THE FOREGOING TERMS IN FULL, FINAL AND COMPLETE SETTLEMENT OF THE PENDING CLAIMS IN THIS MATTER

_____ _____
Mr. Allan Feker Date

At the time the April 29, 1999 letter was sent to Mr. Mason, it was signed by Mr. Massalon and Mr. Feker.

On May 4, 1999, on behalf of Plaintiffs, Mr. Mason executed the April 29, 1999 letter and returned it to Defendants' counsel with a cover letter stating that Plaintiffs' counsel's signature on behalf of Plaintiffs created a "mutually binding and enforceable settlement of this case." (Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The cover letter went on to state that the parties would

meet with Judge Norton in his chambers on Friday, May 7, 1999 at 9:30 a.m. for the purpose of finding out how Judge Norton wants to administratively handle the enforcement of the settlement if the need should arise. This will allow Plaintiffs to choose between judicial enforcement of the settlement or the $1,000,000 mortgage as the alternate security for the settlement as set forth in Paragraph 2 of your letter.

(Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement)

On Friday May 7, 1999, the parties appeared in chambers. Present at the in-chambers meeting were the undersigned, judicial law clerk Rodney Patton, attorneys Mark A. Mason and Anthony E. Forsberg on behalf of Plaintiffs, and attorney John A. Massalon on behalf of Defendants. At this meeting, the court was informed that the case had been settled. The parties inquired whether the court would retain jurisdiction over the case until October 15, 1999 for the purpose of enforcing the settlement agreement and, in particular, the installment payments called for by the parties' settlement agreement, the last of which was due October 1, 1999. At this in-chambers meeting, the court advised the parties that it would retain jurisdiction to enforce the settlement. The court indicated that in connection with the parties' settlement agreement, a *Ruben* order should be prepared by the parties and submitted to the court. The requested *Ruben* order was to provide that the court retained jurisdiction to enforce the settlement. In fact, the parties had already reached agreement on this point prior to the in-chambers meeting, and one of the purposes of the meeting was to ensure that the court would exercise its discretion to retain jurisdiction to enforce the parties' settlement agreement. In this regard, the parties' settlement agreement provided:

the Defendants will consent to the continuing jurisdiction of the United States District Court for the District of South Carolina, Charleston Division, to enforce

the settlement. The parties will ask Judge Norton to enter a *Ruben* order removing the case from the active roster pending the entry of a final order of dismissal with prejudice no later than October 15, 1999. In the event that the Defendants fail to timely pay any portion of the settlement, Plaintiffs can apply to Judge Norton for the entry of judgment against the Defendants for the balance of the settlement proceeds, plus attorney's fees and costs incurred in enforcing the settlement. However, under no circumstances will Plaintiffs be entitled to reopen the case or seek damages in excess of the balance of the settlement funds and collection costs.

(Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) After the meeting, all discovery in the case ceased. Deadlines passed. And no further settlement negotiations took place between the parties.

On June 16, 1999, Plaintiffs' counsel forwarded to Defendants' counsel the formal settlement documents called for by the April 29, 1999 letter. The formal Settlement Agreement consisted of the following documents: the agreed Confidential Settlement Agreement and Mutual Release of All Claims; the agreed reference letters for Plaintiffs Riggins and NeSmith, the agreed Cancellation of Lis Pendens, the agreed Joint Stipulations Striking Certain Allegations from Plaintiffs' Complaint, the agreed Stipulation of Dismissal with Prejudice of Plaintiffs' Civil RICO Claims, the agreed Joint Stipulation of Dismissal with Prejudice and proposed Order of Dismissal with Prejudice, the agreed Joint Motion to Seal the Record and proposed Consent Order Sealing Record, and an Order of Dismissal with Prejudice of the Sealy Defendants. In all, the formal settlement documents called for by the parties' settlement agreement totaled forty-seven pages.

On June 25, 1999, John R. Bush, Defendants' Florida counsel, wrote to Plaintiffs' local counsel and informed him that Allan Feker "has directed me to advise you that he has elected to discontinue settlement negotiations. He has reviewed the package that you provided last week, and your terms are not acceptable." (Exhibit 3 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement). As a result, Defendants refused to execute the formal settlement documents, and failed to seek corrections or changes to the proposed formal settlement documents. Additionally, Mr Feker has failed to pay any of the monthly installment payments, which were due to begin on July 1, 1999.

On June 29, 1999, Plaintiffs filed a Motion to Enforce Settlement and for Immediate Entry of Judgment Against Defendants. Defendants have opposed this motion, yet they have offered no testimony from any witness, presented no affidavits in opposition to Plaintiffs' motion, and did not challenge the authenticity of the duly executed settlement letter. However, to reinforce the point that they still believe this case is active, Defendants filed a number of Motions for Summary Judgment, supported by copious amounts of paper.

On July 28, 1999, this court heard oral arguments on Plaintiffs' motion. At the time of the hearing, the previously requested *Ruben* order had not been forwarded to the court so that the case was still an active, pending case over which this court continued to preside. At the hearing, Defendants chose to rely primarily on their argument—unveiled for the first time at the hearing—that the court lacked jurisdiction to enforce the settlement and only secondarily on their argument that the duly executed settlement letter was merely a "letter of intent" and not a binding settlement agreement.

## II. LAW/ANALYSIS

Before this court reaches the merits of Plaintiffs' motion, it must address the question of whether it has subject matter jurisdiction to enforce the settlement agreement.

### A. Court's Jurisdiction to Enforce Settlement Agreement

Even though Defendants raised the issue of this court's jurisdiction to enforce

the settlement agreement for the first time at the motions hearing, a district court may consider challenges to its subject matter jurisdiction whenever raised. *See Selgeka v. Carroll,* 184 F.3d 337, 341 (4th Cir.1999). Defendants argue that this court is without jurisdiction to enforce the settlement agreement. Specifically, citing *Fairfax Countywide Citizens Ass'n v. County of Fairfax, Va.,* 571 F.2d 1299 (4th Cir.1978), Defendants argue that because the district court failed to approve or incorporate the settlement agreement into an order of dismissal, the court must find some independent ground upon which to base federal jurisdiction.

In *Fairfax,* the district court dismissed a race discrimination case after the parties had entered into two settlement agreements. However, the court neither approved the agreements nor incorporated them in its orders of dismissal. Three years later, the plaintiffs moved the district court to vacate its order and enforce the settlement agreements. The Fourth Circuit held that "a district court has the authority under Rule 60(b)(6) to vacate its prior dismissal order and restore the case to its docket." *Id.* at 1303. However, a district court is not empowered, under these circumstances, to enforce a settlement agreement "unless the agreement had been approved and incorporated into an order of the court, or, at the time the court is requested to enforce the agreement, there exists some independent ground upon which to base federal jurisdiction." *Id.* Certainly, Defendants' argument might win the day if this court had dismissed the case and had failed to incorporate the settlement agreement into the order or had failed to include a provision that expressly retained jurisdiction to enforce the agreement. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (finding no jurisdiction under those circumstances). However, that did not happen; instead, after the court was informed that settlement had been reached, there was a delay when no formal settlement documents were executed and no order of dismissal was issued. Consequently, when Defendants decided that the settlement agreement reached earlier was no longer to their satisfaction, the case was still on this court's active docket and was listed on page six of this court's trial roster, dated July 1, 1999, for a jury term to commence on October 6, 1999. In short, nothing had been done to divest this court of jurisdiction.

■ The First Circuit recently set out the following framework for enforcement of settlement agreements, distinguishing between cases such as this and cases such as those that Defendants wish this were:

> A party to a settlement agreement may seek to enforce the agreement's terms when the other party reneges. If, at the time of the claimed breach, the court case already has been dismissed, the aggrieved party may bring an independent action for breach of contract. If, however, the settlement collapses before the original suit is dismissed, the party who seeks to keep the settlement intact may file a motion for enforcement.

*Malave v. Carney Hosp.,* 170 F.3d 217, 219 (1st Cir.1999) (citations omitted). This case falls squarely in the latter category and, as such, the question of jurisdiction is not an issue. The majority of circuits "have uniformly stated that a district court possesses the inherent or equitable power summarily to enforce an agreement to settle a *case pending before it.*" *Wilson v. Wilson,* 46 F.3d 660, 664 (7th Cir.1995) (emphasis added); *see United States v. Hardage,* 982 F.2d 1491, 1496 (10th Cir. 1993); *Brock v. Scheuner Corp.,* 841 F.2d 151, 154 (6th Cir.1988); *Callie v. Near,* 829 F.2d 888, 890 (9th Cir.1987); *Kent v. Baker,* 815 F.2d 1395, 1398–1400 (11th Cir. 1987); *Mid–South Towing Co. v. Har-Win, Inc.,* 733 F.2d 386, 389 (5th Cir.1984); *Autera v. Robinson,* 419 F.2d 1197, 1199 (D.C.Cir.1969); *see also Fairfax Countywide Citizens Ass'n v. County of Fairfax, Va.,* 571 F.2d 1299, 1304 & n. 12 (4th Cir.1978) (distinguishing *Fairfax* from those cases in which the parties entered

into a settlement of a pending action, but, prior to the entry of judgment, one party repudiated the agreement).

Therefore, unlike the situation before the courts in *Kokkonen* and in *Fairfax,* the facts of this case do not require the court to *reacquire* jurisdiction; the court already had jurisdiction over the matter pending before it, and no action was taken to divest it of that jurisdiction. Consequently, Defendants' eleventh hour argument that this court has no jurisdiction to enforce the settlement agreement is without merit.

### B. Exchange of Letters Constituted an Enforceable Settlement Agreement

 A settlement agreement is considered to be a contract. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). Under South Carolina contract law,[2] "[a] contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by

conduct." *Roberts v. Gaskins,* 327 S.C. 478, 486 S.E.2d 771, 773 (Ct.App.1997). Therefore, "[i]n deciding whether a settlement agreement has been reached, the Court looks to objectively manifested intentions of the parties." *Moore v. Beaufort County, North Carolina,* 936 F.2d 159, 162 (4th Cir.1991). To establish that the exchange of letters constituted a contract, Plaintiffs must prove that there was an offer, an acceptance, and valuable consideration. *See Roberts,* 486 S.E.2d at 773; *Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.,* 313 S.C. 215, 437 S.E.2d 122, 125 (Ct.App.1993). Moreover, Plaintiffs must prove that there was a meeting of the minds, a mutual assent to be bound to the essential and material terms of the contract. *See Vessell v. DPS Assocs. of Charleston, Inc.,* 148 F.3d 407, 410 (4th Cir.1998) (applying South Carolina law); *Player v. Chandler,* 299 S.C. 101, 382 S.E.2d 891, 893 (1989); *Stanley Smith & Sons v. Limestone College,* 283 S.C. 430, 322 S.E.2d 474, 477 (Ct.App. 1984).

2. This court will apply South Carolina law to the enforcement of this contract for two reasons. First, most of the claims settled were state-law claims. Second, even though this court must apply the federal common law to the settlement of federal claims such as the RICO and Title VII claims, this court would look to the law of the forum state for well-established contract principles. "Settlements ... assertedly entered into in respect of federal litigation already in progress implicate federal procedural interests distinct from the underlying substantive interests of the parties ... [, so that] the standards by which that litigation may be settled, and hence resolved short of adjudication on the merits, are preeminently a matter for resolution by federal common law principles, independently derived." *Gamewell Mfg., Inc. v. HVAC Supply, Inc.,* 715 F.2d 112, 115 (4th Cir.1983). As a result, the Fourth Circuit found it proper to "apply an independently derived federal standard to govern resolution of the settlement issues raised in [that] case." *Id.* at 116. To provide some content to federal common law, a district court "is free to choose any rule it deems appropriate, and it may look for guidance to other federal contexts, to what it perceives to be first principles, to considerations of equity and convenience, or to the law of the forum state." Charles Alan Wright

et al., *Federal Practice & Procedure* § 4514, at 457 (1996). As the Fourth Circuit put it, district courts should "seek the appropriate federal rule in the usual sources—the best-reasoned decisions in the general common law." *Gamewell Mfg., Inc.,* 715 F.2d at 115. Even though federal common law controls, this

does not mean necessarily that the federal courts should or will formulate an independent federal rule of law. In many cases, relevant factors may indicate that the federal courts should follow or 'adopt' the law of the forum state as the governing rule of decision, although it will be doing so as a matter of federal law. In other words, the federal courts may apply state law—not because of any compulsion to do so ... but because federal interests would not be impaired by doing so, state law is 'already there,' people are familiar with it, and the state rule is not inimical to federal interests.

Charles Alan Wright et al., *Federal Practice & Procedure* § 4514, at 474–76 (1996). This court can conceive of no reason why South Carolina contract law should not be applied to the settlement of all claims in this case, including the federal claims, as these principles are well-known to counsel who negotiated and drafted the settlement letters and are not inimical to federal interests.

First, Defendants made an offer to Plaintiffs in this case. " 'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it'." *Carolina Amusement Co.*, 437 S.E.2d at 125 (*quoting* Restatement (Second) of Contracts § 24 (1981)). In his letter dated April 29, 1999, John A. Massalon, local counsel for Defendants, described his letter as a "proposal" to Plaintiffs' counsel and to Allan Feker. The latter was to manifest "his agreement to settle" on the terms provided in the letter by signing his name in the space provided at the foot of the letter and returning a copy of the letter with his signature to his local counsel via facsimile. Mr. Feker did so. The letter asked Mr. Mason to "please indicate your acceptance of the foregoing terms on behalf of the Plaintiffs by signing in the space below and returning the same to me by facsimile." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) In other words, Mr. Mason was invited to accept the terms of Mr. Massalon's proposal, or offer. *See Carolina Amusement Co.*, 437 S.E.2d at 125 ("The offer identifies the bargained for exchange and creates a power of acceptance in the offeree.").

Second, Plaintiffs accepted Defendants' offer. At the foot of the letter from Mr. Massalon, Mr. Mason signed on behalf of Plaintiffs that he "agree[d] to the foregoing terms in full, final and complete settlement of the pending claims in this matter." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Moreover, the same day he signed at the foot of Mr. Massalon's letter, May 4, 1999, Mr. Mason wrote a letter to Mr. Massalon in which he noted that the letter of April 29, 1999, "confirm[ed] that the Feker Defendants have offered to pay ... $585,000 in full, final and complete settlement of all claims in the above referenced matter." (Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Mr. Mason added that, on behalf of Plaintiffs, "I hereby accept the said offer of settlement." [3] (Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Mr. Massalon's letter was an offer, and Mr. Mason's response was an acceptance.

Third, there was valuable consideration for the parties' agreement. In this case, the element of consideration is simple. Plaintiffs bargained for the sum of $585,000 to be paid in four monthly installments in exchange for settling all of their claims against the Feker Defendants.

Finally, there was a meeting of the minds, an objective manifestation of the parties mutual assent to the essential and material terms of the contract. "A meeting of minds is based upon the intent and purposes as shown by all the circumstances." *Rickborn v. Liberty Life Ins. Co.*, 321 S.C. 291, 468 S.E.2d 292, 300 (1996). Language from the two letters and from the surrounding circumstances supports this court's finding that these parties intended to be bound by the agreement reached through the exchange of the letters. Both Mr. Feker and Mr. Mason signed the letter drafted by Mr. Massalon, outlining the essential terms of the agreement. They signed their names under the header which stated that "I agree to the foregoing terms in full, final and complete settlement of the pending claims in this matter." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Indeed, Mr. Feker's signature was specifically described as "indicating his agreement to settle on the ... terms" outlined in the letter. (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Among the terms outlined in the letter were provisions that specified

---

**3.** Although Mr. Mason's letter dated May 4, 1999, contained two points of clarification, they were simply a written memorialization of an oral agreement on these two issues reached during a telephone conversation between Mr. Mason and Mr. Massalon. Consequently, these points of clarification did not vary the terms of the offer. Indeed, Defendants have not made such an argument.

the sum to be paid, the method of payment, the method of enforcement if payment was not made, the preservation of discovery documents as confidential, the release of all claims, and even payment for a disputed DELL computer.

In his letter of response, Mr. Mason indicated that he had executed the letter from Mr. Massalon, which had been executed by Mr. Feker, "thereby creating a mutually binding and enforceable settlement of this case." (Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) One would imagine that able counsel for Defendants would have expressly objected to this characterization if this did not accurately reflect the status of the parties' settlement negotiations. However, Defendants have not provided this court with any evidence that they objected or disagreed, nor have they argued that they objected orally to such a characterization.

 Three days after this letter from Mr. Mason, local counsel for the parties met with the court in-chambers and informed the court that the case had been settled. The statements made by Mr. Massalon in-chambers are binding on his clients. *See Arnold v. Yarborough*, 281 S.C. 570, 316 S.E.2d 416, 417 (Ct.App.1984) ("Acts of an attorney are directly attributable to and binding upon the client.... Absent fraud or mistake, where attorneys of record for a party agree to settle a case, the party cannot later repudiate the settlement.")[4]; *see also Hall v. Benefit Ass'n of Ry. Employees*, 164 S.C. 80, 161 S.E. 867, 868 (1932) ("The parties to a suit are bound by admissions, made by their attorneys of record, in open court, or elsewhere, touching matters looking to the progress of the trial.").

After the meeting in-chambers, all discovery ceased and deadlines passed without a murmur from either party. Indeed, Plaintiffs' counsel canceled three depositions, Defendants' counsel canceled three depositions, Defendants retracted records subpoenas, and deadlines for discovery responses and amendments to pleadings came and went and neither party contended that the other had failed to comply. All counsel stopped sending the court their attorneys' bills as the court had required them to do on the 15th of each month. This conduct speaks volumes. *See Wright v. Trask*, 329 S.C. 170, 495 S.E.2d 222, 226 (Ct.App.1997) ("[S]ubsequent acts are relevant to show whether a contract was intended."). Had settlement not yet been reached, the parties would surely not have left such a disputatious case on the backburner.

Based on the foregoing, this court finds that the exchange of letters, taken in the light of the surrounding circumstances, constituted an offer, acceptance, consideration, and a manifestation of mutual assent to be bound to the terms of the settlement agreement outlined in Mr. Massalon's letter.

 Defendants see things differently. Defendants argue that no settlement agreement was reached because the letter from Mr. Massalon was a "letter of intent," and not an offer, and that the parties did not intend to be bound until a formal settlement agreement was executed.[5] Black's Law Dictionary states that a "letter of intent is customarily employed to

---

4. Authority to enter into the settlement agreement is not an issue in this case. At the hearing, Mr. Bush stated that Mr. Massalon was fully authorized by his client to send the April 29, 1999 settlement letter, which had previously been signed by Mr. Allan Feker, to Plaintiffs' counsel and that there existed no challenge by Mr. Feker to Mr. Massalon's authority to enter into the settlement on behalf of his client. (Tr. of Hearing, dated July 28, 1999, at p. 27 l. 24 to p. 28 l. 2)

5. Defendants made another argument that this court may disregard without much analysis. Defendants argued that Plaintiffs' submission of the settlement package about forty-five days after the exchange of letters was in violation of the parties' agreement to "use their best efforts to have the Settlement Agreement executed by Friday May 7, 1999." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The court disregards this argument for three reasons. First, such an argument is counterintuitive because Defendants argue that no agreement was actually reached by the exchange of letters. Second, the letters did not mention that time was of the essence. Third, Defendants

reduce to writing a preliminary understanding of parties who intend to enter into contract." *Black's Law Dictionary* 904 (6th ed.1990); *see also Bat Masonry Co. v. Pike–Paschen Joint Venture III,* 842 F.Supp. 174, 177 (D.Md.1993) (noting that a letter of intent is at most an agreement to agree or a proposal to contract in the future). In contrast to the wealth of detailed language and surrounding circumstances supporting Plaintiffs' argument, there are only a few words in Mr. Massalon's letter that can be tortured to support Defendants' argument that the letter was not an offer, but rather a non-binding letter of intent to pave the way for further negotiations and ultimately a formal and comprehensive Settlement Agreement. Much of the pertinent language appears in the penultimate paragraph of Mr. Massalon's letter in which he states that

> [t]his letter is intended to memorialize the basic framework of an agreement and it is not intended as a final expression of the terms of the settlement. The exact terms will be expressed in a more comprehensive Settlement Agreement. However, if this letter does not accurately reflect the broad parameters of our agreement, please contact me.

(Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Nevertheless, such language is not inconsistent with an intent to be bound by the terms of the letter. Unlike the typical "letter of intent," Mr. Massalon does not state that the letter is non-binding; he simply states that the letter is not "a final expression of the terms of the settlement" because a formal Settlement Agreement is to be drafted. As will be discussed below, the intent to draft such a formal document does not prevent the formation of a contract if the evidence demonstrates that the parties intended to be bound.

Although Defendants rest most of their argument on the merits on that one paragraph, a few other words in the letter also support, to a limited degree, the argument that the parties did not intend to be bound by the exchange of letters. In paragraphs four, five, eight, and nine, the letter provides that "Plaintiffs *will* agree" or "Plaintiffs *will* represent and warrant." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) (emphasis added) According to Defendants, such language evidences an agreement to agree, and not a contract. However, the letter is also spiced with language indicating a present agreement such as "Defendants have agreed to pay" or "Plaintiffs agree to release and forever discharge the Defendants." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) Moreover, had Mr. Massalon intended his letter to be a "letter of intent," he surely could have identified it as such. He was familiar with the term. In the very first sentence of his letter, he states that "Mr. Feker and I have discussed the letter of intent that you drafted during our meeting with him and Mrs. McDonald on April 26, 1999." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) After recognizing the existence of such a creature, Mr. Massalon proceeded to refer to his letter as "my initial offer" and "this proposal to you." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) In sum, because of the paucity of language supporting Defendants' argument that Mr. Massalon's letter was a letter of intent, and the weighty evidence from the letters and surrounding circumstances in support of Plaintiffs' argument that the letter constituted an offer, this court finds that Defendants' argument is insufficient to create a material issue of fact as to the parties' intent.[6]

have not argued that they would have signed the formal documents had they been received several weeks earlier, nor have Defendants alleged that they were prejudiced in any way by the delay. For these reasons, the court summarily dispenses with this throw-away argument.

6. Because the court is certain that there is no question of material fact regarding the parties' intent to be bound, it may summarily enforce the settlement agreement without a plenary hearing. "Trial courts possess the inherent authority to enforce a settlement agreement and to enter judgment based on an

Defendants also argue that the parties did not intend to be bound by these letters because they were intending to execute a formal settlement agreement. "There can be no contract so long as, in the contemplation of the parties thereto, something remains to be done to establish contract[ual] relations." *Hughes v. Edwards,* 265 S.C. 529, 220 S.E.2d 231, 234 (1975). Both of the letters expressly contemplated that a formal Settlement Agreement would be executed. In his letter, Mr. Massalon observed that the letter was "not intended as a final expression of the terms of the settlement. The exact terms will be expressed in a more comprehensive Settlement Agreement." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) In Mr. Mason's letter, he observed that, "[a]s is customary, formal settlement documents will need to be executed." (Exhibit 2 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) "[T]here is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document." *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership,* 734 F.Supp. 1181, 1188 (D.Md.1990); *see Showcase Woodworking, Ltd. v. Fluor Daniel, Inc.,* CIV.A. No. 89-00656–R, 1990 WL 518129, at *2 (E.D.Va. Apr.17, 1990) (unpublished opinion) ("[Although a] formal written contract is not necessary for the formation of a binding agreement[,] . . . the fact that the parties intend to have a formal contract drawn up is evidence that they do not intend previous negotiations to amount to a binding contract."); *see also Bat Masonry Co. v.*

*Pike–Paschen Joint Venture III,* 842 F.Supp. 174, 177 (D.Md.1993) (quoting the language from *Showcase Woodworking, Ltd.* approvingly).

■ However, "[f]ailure to complete formal settlement papers does not indicate that a settlement agreement was not in fact reached." *United States v. Centex–Simpson Constr. Co.,* 34 F.Supp.2d 397, 400 (N.D.W.Va.1999). Indeed, an intent to memorialize a contract in a subsequent writing will not prevent a reviewing court from finding an enforceable contract so long as the parties intended to be bound by the earlier documents. *See Rennick v. O.P.T.I.O.N. Care, Inc.,* 77 F.3d 309, 313 (9th Cir.1996); *Cranbrook Investors, Ltd. v. Great Atl. Management Co.,* 28 F.Supp.2d 982, 987 (E.D.Va.1998); *SS&LC Group, Inc. v. Ryland Group, Inc.,* CIV.A. No. HAR 95–2168, 1996 WL 250029, at *3 (D.Md. Feb.23, 1996) (unpublished opinion). Neither party expressed any intent that a binding agreement depended upon the execution of future formal writings. In fact, the settlement agreement is to the contrary. Mr. Massalon's letter states that the settlement "is final and binding," irrespective of actions of third parties arising from the suit and that it is "final and binding" irrespective of the court's decision on the parties' joint motion to seal the record. Moreover, the words of the parties placed in all capital letters above their signature lines indicated that they intended to be bound by the terms of the settlement letter "in full, final and complete settlement of the pending claims in this matter." (Exhibit 1 to Plaintiffs' Memo. in

agreement without a plenary hearing." *Petty v. Timken Corp.,* 849 F.2d 130, 132 (4th Cir. 1988); *see Wood v. Virginia Hauling Co.,* 528 F.2d 423, 425 (4th Cir.1975); *Mungin v. Calmar Steamship Corp.,* 342 F.Supp. 484, 485 (D.Md.1972). However, "summary enforcement is inappropriate when there is a material dispute about the existence of a settlement agreement." *Petty,* 849 F.2d at 130. Because a settlement agreement is considered a contract, an evidentiary hearing will be necessary if there is a genuine issue of material fact about whether the parties formed a contract.

*See Young v. Federal Deposit Ins. Corp.,* 103 F.3d 1180, 1194 (4th Cir.1997); *Ozyagcilar v. Davis,* 701 F.2d 306, 308 & n. 1 (4th Cir. 1983); *Millner v. Norfolk & Western Ry. Co.,* 643 F.2d 1005, 1009 (4th Cir.1981); *see also Malave v. Carney Hosp.,* 170 F.3d 217, 220 (1st Cir.1999). This court finds, for the reasons set forth in this Order, that—despite Defendants' arguments—there is no genuine issue of material fact as to the parties' intent. Consequently, a plenary hearing is unnecessary.

Support of Motion to Enforce Settlement) The court was advised by Plaintiffs' attorney and Defendants' attorney that a settlement had been reached three days after the settlement letter was signed by the parties, thus indicating that both parties regarded the settlement letter as binding. As a result, the actual signing of the formal settlement documents was "a mere formality," a memorialization of previously agreed upon terms, as the parties intended to be bound, regardless of an agreement to subsequently execute a formal Settlement Agreement.

■ Finally, Defendants argue that Plaintiffs' attempted inclusion of an *ex parte* procedure for enforcement of the settlement into the draft Settlement Agreement indicates that there had been no mutual assent to form a contract with the exchange of letters. The weakness of this argument is evident from the fact that this is Defendants' sole objection to the forty-seven pages of formal settlement documents delivered to Defendants by Plaintiffs' counsel. At the hearing. Mr. Bush, in response to the court's question, acknowledged that the formal settlement documents consisting of forty-seven pages, which were delivered by Plaintiffs' counsel to Defendants' counsel on June 16, 1999, complied in all respects with the parties' earlier letters, with the exception of the inclusion by Plaintiffs' counsel of the words *ex parte* in the paragraph of the formal Settlement Agreement that dealt with the judicial enforcement of the settlement. (Tr. of Hearing, dated July 28, 1999, at p. 24, ll. 12–21) [7] The April 29, 1999 settlement agreement provided that "[i]n the event that the Defendants fail to timely pay any portion of the settlement, Plaintiffs can apply to Judge Norton for the entry of judgment against the Defendants

for the balance of the settlement proceeds, plus attorneys fees and costs incurred in enforcing the settlement." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) The provision did not specify that this application could or could not be "*ex parte.*"

Despite Plaintiffs' specification in the proposed formal settlement documents that the method of enforcement would be "*ex parte,*" when this was not specified in the parties' earlier agreement, Defendants cannot transmogrify this partial inconsistency into a finding that there was never any mutual assent to form a contract with the exchange of letters. This is so for two reasons. First, the mechanism of enforcement of the settlement agreement is not even a material term of the settlement, as the parties had already agreed that this court would retain jurisdiction to enforce the settlement if Mr. Feker proved to be a recalcitrant participant.[8] Second, although "continual redrafting of a document indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of the written agreement," *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership,* 734 F.Supp. 1181, 1189 (D.Md.1990), no such redrafting was evident in this case. The attempted inclusion of a provision regarding an *ex parte* application for enforcement of the settlement, and a provision regarding the False Claims Act, appear to be—at best—simply unilateral attempts by Plaintiffs to clarify the terms of the earlier agreement. Such not being material terms of the contract, Defendants would have been warranted in rejecting the new proposals, but they cannot vitiate the underlying contract based upon these new proposals. *See Worthy v. McKesson*

7. Although Defendants did not refer to it, Plaintiffs also tried to include in the formal Settlement Agreement a provision regarding the False Claims Act that had not been a part of the exchange of letters. For the same reasons that the *ex parte* provision is not part of the parties' settlement agreement, this court finds that Plaintiffs' proposed provision

regarding the False Claims Act is also not part of the agreement.

8. Indeed, the court notes that the *"ex parte"* argument may even be moot as Plaintiffs filed this motion to enforce the settlement agreement and for immediate entry of judgment and did not move *ex parte* for its enforcement.

*Corp.*, 756 F.2d 1370, 1373 (8th Cir.1985) ("'[T]he fact that the parties left insubstantial matters for later negotiation ... does not vitiate the validity of the agreement reached.'") (*quoting Trnka v. Elanco Products Co.*, 709 F.2d 1223, 1226 n. 2 (8th Cir.1983)); *Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771, 773 (Ct.App. 1997) (finding that a party seeking to modify a contract had to demonstrate that the modification was supported by all the elements of a valid contract).

In sum, although there may be some slight ambiguity at first blush, upon a full consideration of the language of the letters and the surrounding circumstances, it is clear that the parties intended to be bound by the terms enumerated in Mr. Massalon's letter. Accordingly, this court will enforce the settlement agreement freely and voluntarily entered into by the parties on May 4, 1999.

### C. Monetary Judgment, Prejudgment Interest, and Attorney's Fees and Costs

#### 1. Monetary Judgment

■ In their Response to Plaintiffs' Counsel's Submission Regarding Interest, Defendants argue that there is no basis for this court to enter a monetary judgment. Instead, according to Defendants, "the only appropriate order would be a declaration that the parties have reached an accord." (Def.'s Response, dated Sept. 7, 1999) The court disagrees. This court has the inherent authority to *enforce* settlement agreements, not simply to declare whether such agreements were or were not made. *See Petty v. Timken Corp.*, 849 F.2d 130, 132 (4th Cir.1988). Consequently, this court's Order will enforce the entire settlement agreement, including Defendants' promise to pay Plaintiffs $100,000, plus four installment payments of $121,250 for a final total of $585,000.

#### 2. Award of Prejudgment Interest

"The decision to award prejudgment interest is a matter within the district court's discretion." *Cox v. Shalala*, 112 F.3d 151, 155 (4th Cir.1997). This court finds that it would be inequitable to permit Defendants to profit from their attempts to avoid the settlement agreement that they freely and voluntarily entered by retaining the interest on the money they should have paid to Plaintiffs pursuant to their settlement agreement. Similarly, it would be inequitable not to award Plaintiffs prejudgment interest to compensate them for the loss of the use of the money that they were entitled to be paid under the terms of the settlement agreement. As a result, this court will award Plaintiffs prejudgment interest on each monthly installment from the date each was due until the entry of judgment in this case. Because the other $100,000 was payable immediately upon the execution of the formal settlement documents, and those documents were not executed, this court will not grant Plaintiffs prejudgment interest on that $100,000.

■ "The determination of a certain rate of prejudgment interest is generally a matter of discretion on the part of the district court." *United States v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 940 (4th Cir.1983). Because this court's jurisdiction was founded on federal question jurisdiction with supplementary jurisdiction over the state-law claims, this court is free to choose between the federal rate and the state-law rate. *See id.* (noting that in diversity cases federal courts must apply state-law on prejudgment interest). In the exercise of its discretion, this court elects to apply the state-law interest rate of 8 ¾ percent per annum as a fair and equitable rate that will duly compensate Plaintiffs for the loss of the use of the money. *See* S.C.Code Ann. § 34–31–20(A) (Rev.1987).[9]

---

**9.** The court notes that should Defendants fail to pay Plaintiffs the amount due at the time of the entry of judgment in this case, post-judgment interest will begin to accrue from the date of the entry of judgment until payment is made at the federal rate of interest calculated from the formula set out in 28 U.S.C. § 1961. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir.1999).

### 3. Attorney's Fees and Costs

In their settlement agreement, the parties agreed that, in the event "Defendants fail to timely pay any portion of the settlement, Plaintiffs can apply to Judge Norton for ... attorney's fees and costs incurred in enforcing the settlement." (Exhibit 1 to Plaintiffs' Memo. in Support of Motion to Enforce Settlement) However, Plaintiffs must file a separate motion seeking an award of attorney's fees and costs in compliance with the Local Rules of Civil Procedure.

### III. CONCLUSION

For the reasons set forth in this Order, this court finds that the parties freely and voluntarily entered into a settlement agreement on May 4, 1999. The court has found no evidence of any material dispute as to the existence of an agreement, the material terms of that agreement, or the authority of counsel to enter into the agreement, so the court can enforce the settlement agreement without conducting a plenary hearing. The terms and conditions of this settlement are contained in a duly executed written agreement. The parties advised the court that a settlement had been reached. Based on this settlement, the wheels of justice stopped turning. Now Defendants want to back out of the settlement. This court will not allow that to happen.[10] Instead, this court will enforce the parties' agreement by entering judgment against Defendants in accordance with the parties' settlement agreement.

It is therefore,

**ORDERED,** that Plaintiffs' Motion to Enforce the Settlement Agreement and for Immediate Entry of Judgment be **GRANTED;**

**ORDERED,** that the parties shall comply fully with the Settlement Agreement entered into on May 4, 1999 and incorporated herein;

**ORDERED,** that the Clerk of Court shall forthwith prepare, sign, and enter judgment against Defendants as captioned-above, jointly and severally, in the sum of Five Hundred and Eighty-five Thousand and No/100 ($585,000.00) Dollars,[11] plus prejudgment interest at the rate of 8 ¾ percent per annum on the four monthly installment payments totaling $485,000 as set forth below;

**ORDERED,** that Defendants pay Plaintiffs prejudgment interest at the rate of 8 ¾ percent per annum on the four installment payments due to be paid from July 1, 1999 to October 1, 1999 as follows:

prejudgment interest at the rate of 8 ¾ percent per annum on $121,250 from July 1, 1999 until the entry of judgment in this case;

prejudgment interest at the rate of 8 ¾ percent per annum on $121,250 from August 1, 1999 until the entry of judgment in this case;

prejudgment interest at the rate of 8 ¾ percent per annum on $121,250 from September 1, 1999 until the entry of judgment in this case;

prejudgment interest at the rate of 8 ¾ percent per annum on $121.250 from October 1, 1999 until the entry of judgment in this case;

**ORDERED,** that Plaintiffs shall have fourteen days after the entry of judgment to file and serve a motion for an award of attorney's fees and costs related to the enforcement of the settlement in the man-

---

**10.** *See Young v. Federal Deposit Ins. Corp.,* 103 F.3d 1180, 1195 (4th Cir.1997) ("[H]aving second thoughts about the result of a settlement agreement does not justify setting aside an otherwise valid agreement.").

**11.** "[I]f the district court should determine ... that there was an agreed upon settlement that can be translated into terms of dollars and cents, he should enforce payment of precisely that amount." *Wood v. Virginia Hauling Co.,* 528 F.2d 423, 425 (4th Cir.1975). The parties agreed that "[i]n the event that the Defendants fail to timely pay any portion of the settlement, Plaintiffs can apply to Judge Norton for entry of judgment against Defendants for the balance of the settlement proceeds," which is the full amount of $585,000.

ner provided by Rule 54 of the Federal Rules of Civil Procedure;

**ORDERED,** that this court expressly retains jurisdiction to further enforce the parties' settlement agreement if such becomes necessary and to determine the award of attorney's fees and costs;

**ORDERED,** that this case is hereby **DISMISSED WITH PREJUDICE.**

**AND IT IS SO ORDERED.**